# EXHIBIT A

# LOAN AGREEMENT

Dated as of July 15, 2022

Between

## STATLER CLEVELAND HOLDING, LLC,
a Delaware limited liability company,
as Borrower,

and

## THE UNION LABOR LIFE INSURANCE COMPANY,
a Maryland corporation,
on behalf of one or more of its Separate Accounts,
as Lender,

4885-3089-1555, v. 2

## LOAN AGREEMENT

THIS LOAN AGREEMENT (hereinafter referred to as this "Agreement"), is made and entered into as of the 15th day of July, 2022, by and between **THE UNION LABOR LIFE INSURANCE COMPANY,** a Maryland corporation, on behalf of one or more of its Separate Accounts, having its principal office and place of business at 8403 Colesville Road, Silver Spring, Maryland 20910-6331 (hereinafter referred to as "Lender"), and **STATLER CLEVELAND HOLDING, LLC,** a Delaware limited liability company (hereinafter referred to as "Borrower").

### WITNESSETH:

WHEREAS, Borrower has applied to Lender for a first mortgage term loan in the principal amount of Fifty Two Million and No/100 Dollars ($52,000,000.00) (hereinafter referred to as the "Loan") secured by the Mortgaged Property (as hereinafter defined), and Lender has agreed to make the Loan upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties covenant and agree as follows:

### ARTICLE 1
### DEFINITIONS

As used herein, the following terms shall have the following meanings:

"Affiliate" means (a) any corporation in which any Borrower Party or any partner, shareholder, director, officer, member, or manager of any Borrower Party directly or indirectly owns or controls more than ten percent (10%) of the beneficial interest, (b) any partnership, joint venture or limited liability company in which any Borrower Party or any partner, shareholder, director, officer, member, or manager of any Borrower Party is a partner, joint venturer or member, (c) any trust in which any Borrower Party or any partner, shareholder, director, officer, member or manager of Borrower is a trustee or beneficiary, (d) any entity of any type which is directly or indirectly owned or controlled by any Borrower Party or any partner, shareholder, director, officer, member or manager of any Borrower Party, (e) any partner, shareholder, director, officer, member, manager or employee of any Borrower Partner, (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager, or employee of any Borrower Party, or (g) any Borrower Party.

"Applicable Interest Rate" shall mean the lesser of (a) the Maximum Legal Rate, or (b) Term SOFR plus the Benchmark Spread or, if applicable, the Prime Rate. Notwithstanding anything herein to the contrary, the Applicable Interest Rate shall not at any time exceed five and three-quarters percent (5.75%) per annum during the Initial Term (the "Initial Term Interest Rate

Ceiling"), provided, however, that such Initial Term Interest Rate Ceiling shall not apply during the First Extended Term and the Second Extended Term if exercised by Borrower in accordance with the provisions set forth herein.

"Appraisal" shall mean an MAI certified appraisal of the Mortgaged Property performed in accordance with FIRREA and Lender's appraisal requirements by an appraiser selected and retained by Lender.

"Approved Accounting Principles" shall mean sound accounting principles other than GAAP as reasonably approved by Lender and consistently applied; provided, that the accounting principles on which basis the financial statements for Borrower or Guarantor that were provided to Lender before the Closing Date were prepared are deemed to be approved.

"Assignment of Contracts" shall mean that certain Assignment of Contracts, Warranties, Licenses and Permits of even date herewith from Borrower to Lender, as the same may be amended from time to time.

"Assignment of Leases" shall mean that certain Assignment of Rents, Leases and Profits of even date herewith from Borrower to Lender with respect to the Mortgaged Property, as the same may be amended from time to time.

"Ballroom License Agreement" shall mean that certain License Agreement for Use of Ballroom by and between Statler Arms Garage, Inc., an Ohio corporation ("Original Licensor") and Statler Arms, Inc., an Ohio corporation ("Original Licensee"), filed September 21, 1999 as Instrument No. 199909210869 of Cuyahoga County, Ohio records, as assigned by that certain Assignment and Assumption of License Agreements dated May 8, 2006 and recorded on May 10, 2006 as Document No. 200605100708 of Cuyahoga County, Ohio records by and between Original Licensee and PAMI Statler Arms LLC, a Delaware limited liability company ("PAMI"), and as amended by that certain Amendment of License Agreement and Stipulation of Settlement, by and between PAMI and Statler Arms Garage, LLC ("SAG"), dated September 23, 2008, filed June 3, 2011 as Instrument No. 201106030167 of Cuyahoga County, Ohio records, as assigned by Original Licensee to Statler Arms L/CAL LLC, a Delaware limited liability company ("Second Licensee") pursuant to that certain unrecorded Assignment and Assumption of License Agreements dated May 23, 2012, as conveyed to Statler Arms Garage II LLC, an Ohio limited liability company ("SAG 2") (predecessor-by-merger to HH Cleveland Statler L.P., an Ohio limited partnership ("Licensor") pursuant to Quit-Claim Deed dated January 28, 2016 and recorded on February 2, 2016 as Document No. 201602020602 of Cuyahoga County, Ohio records, as assigned by Second Licensee to Borrower pursuant to that certain Assignment and Assumption of License Agreements dated January 30, 2018, as recorded with the Cuyahoga County Office of Fiscal Officer on January 30, 2018 as Document No. 201801300501, as the same may be modified or amended from time to time.

2

4885-3089-1555, v. 2

"Benchmark" shall mean (i) initially, Term SOFR, and (ii) on and after the occurrence of a Benchmark Transition Event and the related Benchmark Transition Date, the Benchmark Replacement determined in accordance with the terms and conditions hereof.

"Benchmark Floor" shall mean 0%.

"Benchmark Rate" shall mean the sum of (i) the greater of (A) the Benchmark, and (B) the Benchmark Floor, and (ii) the Benchmark Spread.

"Benchmark Rate Loan" shall mean the Loan at all such times as interest thereon accrues at a rate of interest based upon the Benchmark pursuant to Section 2.04 hereof.

"Benchmark Replacement" shall mean, with respect to any Benchmark Transition Event, a variable rate or index selected by Lender (which may be, at Lender's option, without limitation, "Daily Simple SOFR," "Daily Compounded SOFR," or "30-Day SOFR Average").

"Benchmark Replacement Adjustment" shall mean, with respect to any Benchmark Replacement and its related Determination Date(s), a spread adjustment (which may be a positive or negative value, or zero) that has been selected by Lender, giving due consideration to (i) any selection or recommendation of a spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, by the Relevant Governmental Body for the applicable Benchmark Replacement and its related Determination Date(s), (ii) any evolving or then-prevailing market convention for determining a spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, for the applicable Benchmark Replacement and its related Determination Date(s) in U.S. dollar-denominated syndicated or bilateral commercial real estate credit facilities, and/or (iii) the spread adjustment (including, without limitation, a "benchmark replacement spread adjustment") or method for calculating or determining the same, then being utilized by Lender or its Affiliates with respect to variable rate commercial real estate loans for the applicable Benchmark Replacement and its related Determination Date(s).

"Benchmark Replacement Conforming Changes" shall mean, with respect to any Benchmark Transition Event, any technical, administrative or operational changes (including changes to the definitions of "Business Day," "Interest Rate Period," "Monthly Payment Date" and "Determination Date," the timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, the applicability of adjustments to the interest rate due to the effect of reserve requirements, preceding and succeeding business day conventions and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of the applicable Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if

3

4885-3089-1555, v. 2

Lender determines that no market practice for the administration of the applicable Benchmark Replacement exists, in such other manner as Lender determines is necessary in connection with the administration of the Loan).

"Benchmark Spread" shall mean (i) during the Initial Term, 3.50% per annum, (ii) during the First Extended Term, if properly exercised by Borrower in accordance with the provisions set forth herein, 3.75% per annum, and (iii) during Second Extended Term, if properly exercised by Borrower in accordance with the provisions set forth herein, 4.00% per annum, in each case subject to the provisions of Section 2.04 hereof (including, without limitation, the adjustment of the Benchmark Spread by the addition thereto of the Benchmark Replacement Adjustment, when applicable hereunder).  Lender's computation of the Benchmark Spread shall be conclusive and binding on Borrower for all purposes, absent manifest error.

"Benchmark Transition Date" shall mean any date designated by Lender for conversion of the then-current Benchmark to a Benchmark Replacement, the selection of which date may be based on, or determined with due consideration for, any of the events described in clauses (1), (2) or (3) of the definition of "Benchmark Transition Event" below (in Lender's sole discretion), as applicable.

"Benchmark Transition Event" shall mean any election by Lender to convert the then-existing Benchmark to a Benchmark Replacement, which such election may be based on, or determined with due consideration for, any of the following (in Lender's sole discretion):

(1) a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark announcing that the administrator has ceased or will cease to provide such Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the then-current Benchmark, the central bank for the currency of such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, which states that the administrator of such Benchmark has ceased or will cease to provide such Benchmark permanently or indefinitely (so long as, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark);

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the then-current Benchmark announcing that such Benchmark is no longer representative;

4

4885-3089-1555, v. 2

(4)     any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body;

(5)     any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated or bilateral credit facilities at such time; and/or

(6)     any variable rate or index then generally being utilized by Lender or its Affiliates with respect to the origination of variable rate commercial real estate loans.

"Benchmark Unavailability Event" shall mean one or more of the following has occurred, at any time or from time to time during the term of the Loan, as determined by Lender (which determination shall be conclusive and binding upon Borrower absent manifest error): (i) at any time while the Loan is a Benchmark Rate Loan and the applicable Benchmark is Term SOFR, the Term SOFR Administrator either temporarily or permanently fails to report Term SOFR on a daily basis; (ii) at any time while the Loan is a Benchmark Rate Loan and the applicable Benchmark is not Term SOFR, the applicable administrator of the then-applicable Benchmark either temporarily or permanently fails to report such Benchmark on a daily basis; (iii) due to any Change in Law, it is unlawful (or asserted by any Governmental Authority to be unlawful) for Lender to maintain the Loan as a Benchmark Loan using the then-current Benchmark; or (iv) adequate and reasonable means do not exist for ascertaining the then-current Benchmark.

"Borrower Party" shall jointly, severally and collectively mean Borrower and Guarantor.

"Borrower Operating Agreement" shall mean that certain Amended and Restated Limited Liability Company Agreement of Borrower, dated as of the Closing Date, as amended by that certain First Amendment to Amended and Restated Limited Liability Company Agreement of Borrower, dated as of the Closing Date, as the same may be supplemented or amended from time to time.

"Building" shall mean that certain approximately 330,333 rentable square foot mixed use apartment building erected on the Land.

"Business Day" means a day other than a Saturday, a Sunday, or a legal holiday on which national banks located in the State of New York or the District of Columbia are not open for general banking business.

"Calendar Quarter" shall mean each three calendar month period, commencing on the first day of January, April, July and October.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request,

5

rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Date" shall mean the date hereof.

"Commercial Leases" shall mean Leases entered into with commercial tenants with respect to the commercial spaces located in the Mortgaged Property.

"Debt Yield Ratio" shall mean the ratio, expressed as a percentage, of the annual Net Operating Income for the most recent trailing six (6) month period ending no more than thirty (30) days prior to the then applicable Maturity Date, and, on a pro-forma basis, for the immediately succeeding six (6) month period, from the Mortgaged Property, to the then outstanding principal balance of the Loan.

"Debt Yield Ratio Covenant" shall have the meaning ascribed thereto in Section 2.09.

"Default Rate" means the greater of (i) one hundred fifty percent (150%) of the Applicable Interest Rate hereunder, or (ii) 500 basis points in excess of the Prime Rate in effect on the date that the Default Rate commences; provided, however, that in no event shall such Default Rate exceed the highest rate permitted by law.

"Determination Date" shall mean, with respect to any Interest Rate Period, either (i) if the then-applicable Benchmark is Term SOFR, the date that is two (2) Term SOFR Business Days prior to the first day of such Interest Rate Period; provided, however, that if Term SOFR does not so appear on the date specified above, then the applicable Determination Date for such Interest Rate Period shall instead be the Term SOFR Business Day first preceding such date specified above, or (ii) if the then-applicable Benchmark is not Term SOFR, the date and time determined by Lender in accordance with the provisions of Section 2.04 hereof relating to Benchmark Replacement Conforming Changes.

"Environmental Indemnity" shall mean that certain Environmental Indemnification Agreement of even date herewith from the Borrower Parties to Lender, by which each Borrower Party shall jointly, severally and collectively indemnify and hold Lender harmless from loss, damage, liability and expense with respect to the presence of Hazardous Materials on, under or upon the Mortgaged Property.

6

"Escrow Agreement" shall mean that certain Unfinished Space and Replacement Reserve Escrow Agreement by and between Borrower and Lender of even date herewith, as the same may be modified or amended from time to time.

"Event of Default" and "Events of Default" shall have the meaning specified in Article 9 hereof.

"Financing Statements" shall mean the financing statements which Lender may from time to time require in order to perfect its security interest in collateral described in the Mortgage and this Agreement, pursuant to the Uniform Commercial Code of the State of Delaware and the State of Ohio.

"First Extended Maturity Date" shall have the meaning ascribed thereto in Section 2.06 below.

"First Extended Term" shall mean, in the event that Borrower exercises the First Extension Option in accordance with the provisions of this Agreement, the period of time commencing immediately following the Initial Maturity Date and ending on the First Extended Maturity Date.

"First Extension Fee" shall have the meaning ascribed thereto in Section 2.07 below.

"First Extension Option" shall have the meaning ascribed thereto in Section 2.06 below.

"GAAP" shall mean generally accepted accounting principles.

"Governmental Authorities" shall mean the United States of America, the State of Ohio, the County of Cuyahoga, the City of Cleveland and any political subdivision of any of them and any agency, department, commission, board, bureau or instrumentality of any of them.

"Governmental Requirements" shall mean all laws, ordinances, orders, rules or regulations of all Governmental Authorities, including without limitation laws, ordinances, orders, rules or regulations with respect to securities, public disclosures, zoning, subdivision, building, safety, fire protection or environmental matters.

"Gross Revenues" shall mean all revenue derived from the ownership and operation of the Mortgaged Property from whatever source, including, but not limited to, rents, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, security deposits (except to the extent determined by Lender to be properly utilized to offset a loss of rent), refunds and uncollectible accounts, proceeds of casualty insurance and condemnation awards.

"Guarantor" shall mean Frank T. Sinito, an adult individual.

7

"Guaranty" shall mean that certain Guaranty and Suretyship Agreement of even date herewith from Guarantor to Lender, as the same may be supplemented or amended from time to time.

"Hazardous Materials" shall have the meaning ascribed thereto in the Environmental Indemnity.

"Initial Interest Rate Period" shall mean the period commencing on the Closing Date and ending on July 31, 2022.

"Initial Maturity Date" shall mean August 1, 2025.

"Initial Term" shall mean the period of time commencing on the Closing Date and ending on the Initial Maturity Date.

"Interest Rate Period" shall mean the Initial Interest Rate Period and, from and after the expiration of the Initial Interest Rate Period, each subsequent period running from and including the first day of each calendar month to and including the last day of each such calendar month during the Term.   Notwithstanding the foregoing: (i) if any Interest Rate Period would otherwise end after the Maturity Date, such Interest Rate Period shall end on the Maturity Date; and (ii) each Interest Rate Period that would otherwise end on a day which is not a Business Day shall end on the immediately following Business Day (or, if such immediately following Business Day falls in the next calendar month, on the immediately preceding Business Day).

"Knowledge" shall mean with respect to a specified Person, (i) information appearing in documents in the custody or under the control of such Person; and (ii) information actually known by such Person.

"Land" shall mean that certain parcel of land situate in the City of Cleveland, County of Cuyahoga, State of Ohio, as more particularly described on Exhibit "A" attached hereto and made a part hereof, upon which the Building is located.

"Lease" shall have the same meaning ascribed thereto in the Assignment of Leases.

"Licenses" shall collectively mean the Ballroom License Agreement and the Parking License Agreement.

"Loan" shall mean the loan to be made pursuant to this Agreement, in the principal amount of Fifty Two Million and No/100 Dollars ($52,000,000.00).

"Loan Application" shall mean that certain Permanent Mortgage Loan Application dated as of May 10, 2022, as the same may be modified or amended from time to time.

4885-3089-1555, v. 2

"Loan Commitment Fee" shall mean that certain commitment fee paid by Borrower to Lender in the amount of Five Hundred Twenty Thousand and No/100 Dollars ($520,000.00) in connection with the Loan.

"Loan Documents" shall mean this Agreement, the Note, the Mortgage, the Assignment of Leases, the Assignment of Contracts, the Guaranty, the Financing Statements, the Environmental Indemnity, the Escrow Agreement and all other documents or instruments executed and delivered by or on behalf of Borrower, Guarantor or third-parties, in connection with the Loan, the Loan Application and the transactions contemplated hereby, as the same may be supplemented or amended from time to time.

"Loan-to-Value Ratio" shall mean the ratio, expressed as a percentage, of the then aggregate outstanding principal amount of the Loan to the then current fair market value of the Mortgaged Property.

"Manager" shall mean Millennia Housing Management, Ltd., an Ohio limited liability company.

"Managing Member" shall mean Statler Cleveland Investment, LLC, an Ohio limited liability company and the managing member of Sole Member.

"Material Adverse Effect" means if, in Lender's reasonable discretion, the use, management, operations or marketability of the Mortgaged Property or the business, operations, management, properties, assets or condition (financial or otherwise) of the Borrower Parties in the aggregate has changed in a manner which materially impairs the value of Lender's security for the Loan, or prevents the timely repayment of the Loan, or prevents the Borrower Parties as a whole from timely performing any of their material obligations under the Loan Documents.

"Material Agreement" means any material written or oral agreement, contract, commitment or understanding requiring payments, pledges, or performance executed or assumed by Borrower in connection with the Mortgaged Property which provides for payments by Borrower over the term of any such agreement, contract, commitment or understanding in excess of $250,000.00.

"Maturity Date" shall mean the Initial Maturity Date, or, if Borrower properly exercises the First Extension Option in accordance with the provisions set forth herein, the First Extended Maturity Date, or if Borrower properly exercises the Second Extension Option in accordance with the provisions set forth herein, the Second Extended Maturity Date, or such earlier date on which the principal balance of the Loan may become due and payable upon acceleration by Lender following an Event of Default.

"Maximum Legal Rate" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan

9

Documents, under the laws of such Governmental Authorities whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Monthly Payment Date" shall mean the first day of each calendar month during the Term.

"Mortgage" shall mean that certain Open-End Mortgage, Security Agreement and Fixture Filing of even date herewith from Borrower to Lender, creating a first mortgage lien on and security interest in the Mortgaged Property, as the same may be supplemented or amended from time to time.

"Mortgaged Property" shall mean all real and personal property and rights in property described in, and encumbered by, the Mortgage, and shall include the Land and the Building.

"Net Cash Flow" shall mean, for any applicable period, the amount by which all cash receipts of Borrower during such period from the ownership or operation of the Mortgaged Property or otherwise arising in respect of the Mortgaged Property exceed the sum of all Operating Expenses actually incurred and paid by Borrower during such period.

"Net Operating Income" shall mean, for any given period, the positive difference between (a) Gross Revenues received by Borrower from the Mortgaged Property for such period, and (b) Operating Expenses of the Mortgaged Property for such period, and shall be established through financial statements of Borrower internally prepared in accordance with GAAP or other Approved Accounting Principles consistently applied, and certified by Borrower to be true and correct in all material respects.

"Note" shall mean that certain Promissory Note of even date herewith from Borrower to Lender in the original principal sum of Fifty Two Million and No/100 Dollars ($52,000,000.00), evidencing the Loan, as the same may be supplemented or amended from time to time.

"Notice" shall have the meaning ascribed thereto in Section 11.01 hereof.

"Operating Expenses" shall mean all costs and expenses relating to the operation, maintenance and management of the Mortgaged Property, including, without limitation, utilities, repairs and maintenance, insurance premiums, real estate taxes, advertising expenses, professional fees, payroll and related taxes, equipment lease payments, and a management fee not to exceed three percent (3%) of Gross Revenues, and customary and reasonable reserves for tenant improvements, leasing commissions and other anticipated customary leasing costs, but excluding actual capital expenditures, debt service, depreciation, amortization and other similar non-cash items, and any unusual or non-recurring costs or expenses approved by Lender in its reasonable discretion.

"Parking License Agreement" shall mean that certain License Agreement for Use of Parking Spaces in Garage by and between Original Licensor and Original Licensee, filed

4885-3089-1555, v. 2

September 21, 1999 as Instrument No. 199909210870 of Cuyahoga County, Ohio records, as assigned by that certain Assignment and Assumption of License Agreements dated May 8, 2006 and recorded on May 10, 2006 as Document No. 200605100708 of Cuyahoga County, Ohio records by and between Original Licensee and PAMI, as amended by that certain Amendment of License Agreement and Stipulation of Settlement, by and between PAMI and SAG, dated September 23, 2008, filed June 3, 2011 as Instrument No. 201106030167 of Cuyahoga County, Ohio records, as assigned by Original Licensee to Second Licensee pursuant to that certain unrecorded Assignment and Assumption of License Agreements dated May 23, 2012, as conveyed to SAG 2 (predecessor-by-merger to Licensor) pursuant to Quit-Claim Deed dated January 28, 2016 and recorded on February 2, 2016 as Document No. 201602020602 of Cuyahoga County, Ohio records, and as assigned by Second Licensee to Borrower pursuant to that certain Assignment and Assumption of License Agreements dated January 30, 2018, as recorded with the Cuyahoga County Office of Fiscal Officer on January 30, 2018 as Document No. 201801300501, as the same may be modified or amended from time to time.

"Permitted Exceptions" shall have the meaning ascribed thereto in the Mortgage.

"Person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

"Phase I Report" shall mean that certain Phase I Environmental Site Assessment prepared by Partner Engineering and Science, Inc. and dated June 20, 2022, as identified as Project No. 22-372588.1.

"Prime" shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest $1/8^{th}$ of one percent (1%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index.

"Prime Floor" shall mean the Benchmark Floor.

"Prime Rate" shall mean the sum of (i) the greater of (A) Prime and (B) the Prime Floor, and (ii) the Prime Spread.

"Prime Rate Loan" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon Prime pursuant to Section 2.04 hereof.

11

"Prime Spread" shall mean the difference (expressed as the number of basis points) between (a) the Benchmark Rate on the Determination Date that the Benchmark was last applicable to the Loan and (b) Prime on the Determination Date that the Benchmark was last applicable to the Loan; provided, however, in no event shall such difference be a negative number.

"Principal Sum" shall mean the entire outstanding principal balance of the Loan as of the date upon which such calculation or determination shall be made

"Property Management Agreement" shall meant that certain Property Management Agreement dated as of January 30, 2018, between Borrower and Manager.

"Relevant Governmental Body" shall mean the Board of Governors of the Federal Reserve System of the United States (hereinafter referred to as the "FRB") and/or the Federal Reserve Bank of New York (hereinafter referred to as the "NYFRB"), or a committee officially endorsed or convened by the FRB and/or the NYFRB, or any successor thereto.

"Residential Leases" shall mean Leases entered into with respect to the residential apartments located in the Mortgaged Property.

"Second Extended Maturity Date" shall have the meaning ascribed thereto in Section 2.06 below.

"Second Extended Term" shall mean, in the event that Borrower exercises the Second Extension Option in accordance with the provisions of this Agreement, the period of time commencing immediately following the First Extended Maturity Date and ending on the Second Extended Maturity Date.

"Second Extension Fee" shall have the meaning ascribed thereto in Section 2.08 below.

"Second Extension Option" shall have the meaning ascribed thereto in Section 2.06 below.

"Single Purpose Entity" shall mean an entity (other than a government or any agency or political subdivision thereof), which exists solely for the purpose of owning the Mortgaged Property, conducts business only in its own name, does not engage in any business or have any assets unrelated to the Mortgaged Property, does not have any indebtedness other than the Subordinate Debt and as otherwise permitted by this Agreement, has its own separate books, records, and accounts (with no commingling of assets), holds itself out as being an entity separate and apart from any other entity, and observes corporate and partnership formalities independent of any other entity.

"Sole Member" shall mean Statler Cleveland, LLC, an Ohio limited liability company and the sole member of Borrower.

4885-3089-1555, v. 2

"Subordinate Debt" shall mean that certain unsecured indebtedness of Borrower to Managing Member in the outstanding principal amount as of the date hereof of Three Million Six Hundred Forty Thousand Seven Hundred Ninety Three and 24/100 Dollars ($3,640,793.24), which Subordinate Debt has been subordinated to the Loan pursuant to that Subordination Agreement.

"Subordination Agreement" shall mean that certain Subordination Agreement of even date herewith by and between Borrower, Managing Member and Lender, as the same may be modified or amended from time to time.

"Subordination of Management Agreement" shall mean that certain Subordination, Attornment and Collateral Assignment of Management Agreement of even date herewith by and between Borrower, Lender and Manager, as the same may be modified or amended from time to time.

"Term" shall mean the period of time commencing on the Closing Date and ending on the Maturity Date.

"Term SOFR" shall mean with respect to each Interest Rate Period, the rate identified as "1 Month CME Term SOFR" by the Term SOFR Administrator on the CME Market Data Platform https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html (or any successor source for the rate currently identified as "1 Month CME Term SOFR" identified as such by the Term SOFR Administrator from time to time) as of 6:00 a.m. (New York City time) on the Determination Date (rounded upwards, if necessary, to the nearest 1/8th of 1%).

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited or a successor administrator of the rate currently identified as "1 Month CME Term SOFR" that has been broadly adopted by the commercial real estate finance industry as a successor administrator of such rate, as determined by Lender in good faith.

"Term SOFR Business Day" shall mean any day except for a Saturday, Sunday, a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. governmental securities or a day for and on which the Term SOFR Administrator is not required to publish Term SOFR in accordance with the applicable guidelines, rules or requirements for, or announcements regarding, the publication of Term SOFR as issued and in force by, or with respect to, the Term SOFR Administrator from time to time.

"Title Insurer" shall mean Everest Land Title Agency Ltd., as agent for Fidelity National Title Insurance Company.

13

4885-3089-1555, v. 2

"Title Policy" shall mean the policy of title insurance issued to Lender by the Title Insurer with respect to the Mortgage and the Loan.

ARTICLE 2
THE LOAN

Section 2.01. The Note. The Loan made to Borrower by Lender shall be evidenced by that certain Promissory Note of even date herewith in the original principal amount of Fifty Two Million and No/100 Dollars ($52,000,000.00), executed by Borrower and payable to the order of Lender. Such Promissory Note, as the same may be amended, modified or restated from time to time, along with any and all extensions and renewals thereof and any promissory note issued in substitution or replacement therefor, is referred to herein as the "Note".

Section 2.02 Applicable Interest Rate. Subject to the further provisions of this Agreement, including, without limitation, Section 2.04 and Section 2.05 hereof, interest on the outstanding principal balance of the Note shall accrue and be payable, from the Closing Date until the entire outstanding principal balance of the Note is repaid in full, at the Applicable Interest Rate.

Section 2.03. Default Rate. In the event that, and for so long as, any Event of Default has occurred and remains outstanding, at the election of Lender, the outstanding principal balance and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

Section 2.04. Interest Calculation.

(a) Interest on the outstanding principal balance of the Note shall be calculated by multiplying (i) the actual number of days in the period for which the calculation is being made by (ii) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (iii) the outstanding Principal Sum of the Note. The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Rate Period in which such Monthly Payment Date falls. Borrower understands and acknowledges that such interest accrual requirement results in more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan. Interest on the outstanding Principal Sum of the Note existing at the commencement of an Interest Rate Period shall accrue for the entire Interest Rate Period and shall be owed by Borrower for the entire Interest Rate Period regardless of whether the principal portion of the Loan is repaid prior to the expiration of such Interest Rate Period.

14

(b)     The following additional provisions shall apply and, subject to Section 2.04(c) hereof, the Applicable Interest Rate shall be determined in accordance with this Section 2.04(b):

(i)     Subject to the terms and conditions hereof, the Loan shall be a Benchmark Rate Loan, and the Applicable Interest Rate with respect to each Interest Rate Period shall be the Benchmark Rate, unless the Loan is converted to (and for so long as the Loan remains) a Prime Rate Loan pursuant to the provisions hereof, in which case the Applicable Interest Rate with respect to the applicable Interest Rate Period shall be the Prime Rate. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a Benchmark Rate Loan to a Prime Rate Loan, or vice versa.

(ii)     Any change in the rate of interest hereunder due to (1) a change in the Benchmark or Prime, as applicable, or (2) a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, shall, in each such case, become effective as of the opening of business on the first day on which such change or conversion shall become effective.

(iii)     Subject to the final sentence of this clause (iii), upon the occurrence of a Benchmark Unavailability Event, Lender shall forthwith give notice thereof (which notice may be given by telephone and confirmed in writing) to Borrower at least one (1) day prior to the last day of the related Interest Rate Period.  If such notice is given, then the related outstanding Benchmark Rate Loan shall be converted, on the last day of the then current Interest Rate Period, to a Prime Rate Loan and Borrower shall cooperate with any and all reasonable requests of Lender to make any necessary changes to this Agreement or the other Loan Documents to conform the same to such change in the interest rate hereunder. Notwithstanding the foregoing, in the event that both a Benchmark Unavailability Event and a Benchmark Transition Event have occurred, the provisions of this Agreement relating to the Benchmark Transition Event shall govern and control unless a Benchmark Unavailability Event has also occurred with respect to the applicable Benchmark Replacement, in which case the provisions of this Agreement relating to the Benchmark Unavailability Event shall govern and control.

(iv)     Subject to the final sentence of this clause (iv), if, pursuant to the terms hereof, any portion of the Loan has been converted to a Prime Rate Loan and Lender shall determine that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice of such determination (which notice may be given by telephone, confirmed in writing), to Borrower at least one (1) day prior to the last day of the related Interest Rate Period.  If such notice is given, the related outstanding Prime Rate Loan shall be converted to a Benchmark Rate Loan on the last day of the then current Interest Rate Period. Notwithstanding the foregoing, in the event that a Benchmark Transition Event has occurred, the provisions of this Agreement relating to the Benchmark Transition Event shall govern and control.

(v)     Upon the occurrence of a Benchmark Transition Event, the

4885-3089-1555, v. 2

applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder as of the applicable Benchmark Transition Date, without the need for any amendment to, or further action or consent of any other party to, this Agreement or any of the other Loan Documents, and from and after such Benchmark Transition Date the Loan shall continue to be deemed to be a Benchmark Rate Loan, bearing interest at the new Benchmark. In no event shall Borrower have the right to change the Benchmark, or to unilaterally implement any Benchmark Replacement Adjustment.

(vi)     In connection with any Benchmark Transition Event, Lender shall have the right to make Benchmark Replacement Conforming Changes to this Agreement or any of the other Loan Documents from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any such Benchmark Replacement Conforming Changes will become effective without any further action or consent of Borrower, Guarantor, or any other Person. In addition, within fifteen (15) Business Days after request by Lender, Borrower shall execute, acknowledge, and deliver, at Borrower's cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, documents, agreements, assurances, and such other instruments as Lender may reasonably require from time to time in such manner as Lender determines is reasonably necessary to implement any applicable Benchmark Replacement Conforming Changes. In no event shall Borrower have the right to unilaterally implement any Benchmark Replacement Conforming Changes.

(vii)     Lender shall promptly notify Borrower of (1) any occurrence of a Benchmark Transition Event and its related Benchmark Transition Date, (2) the implementation of any Benchmark Replacement and related Benchmark Replacement Adjustment, and (3) the implementation of any Benchmark Replacement Conforming Changes; provided, however, that the failure of Lender to deliver any such notice to Borrower shall not in any way undermine the effectiveness of any of the foregoing. Any determination, decision or election made by Lender pursuant to, or in connection with, this Section 2.04 (including, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance or date, or any decision to take or refrain from taking any action, or to make or refrain from making any election or selection) will be conclusive and binding on Borrower and all other parties to the Loan Documents, absent manifest error, and may be made in Lender's sole discretion and without consent from, or consultation with, Borrower, Guarantor, or any other Person.

(viii)     All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, any and all present or future taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto, excluding (1) net income, franchise and branch profits taxes (x) imposed as a result of Lender being organized under the laws of, or having its principal office or applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof), or (y) that are imposed as a result of a present or former connection between Lender and the jurisdiction imposing such tax (other than connections arising from

Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or Loan Document, (2) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in the Loan (other than pursuant to an assignment request by Borrower) or Lender changes its lending office, except in each case to the extent that, pursuant to this Section 2.04(b)(viii), amounts with respect to such taxes were payable either to Lender's assignor immediately before Lender became a party hereto or to Lender immediately before it changed its lending office, (3) taxes attributable to Lender's failure to comply with Section 2.04(b)(xii) below, and (4) any withholding taxes imposed under FATCA (such non-excluded taxes being referred to collectively as "Foreign Taxes").  If any Foreign Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Foreign Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder.  Whenever any Foreign Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Foreign Tax.  Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Foreign Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.  Borrower shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Foreign Taxes (including Foreign Taxes imposed or asserted on or attributable to amounts payable under this Section 2.04(b)(viii)) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Foreign Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.  All amounts payable under this Section 2.04(b)(viii) shall constitute additional interest hereunder and shall be secured by the Mortgage and the other Loan Documents.  The provisions of this Section 2.04(b)(viii) shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Mortgage.  Any reference under this Section 2.04(b)(viii) to "Lender" shall be deemed to include any participant and/or any assignees.

(ix)    If any Change in Law shall hereafter make it unlawful for Lender to make or maintain a Benchmark Rate Loan at the then-applicable Benchmark as contemplated hereunder, then (1) the obligation of Lender hereunder to make such a Benchmark Rate Loan, or to convert a Prime Rate Loan to a such a Benchmark Rate Loan, shall be canceled forthwith and (2) any outstanding Benchmark Rate Loan shall be converted automatically to a Prime Rate Loan on the last day of the then current Interest Rate Period or within such earlier period as required by law.  Borrower hereby agrees to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any out-of-pocket costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain

17

4885-3089-1555, v. 2

such Benchmark Rate Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(x)     If any Change in Law:

(1)     shall hereafter impose, modify, increase or hold applicable any reserve, capital adequacy, tax, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the Benchmark hereunder;

(2)     shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(3)     shall hereafter impose on Lender any other condition, and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this subsection, Lender shall provide Borrower with not less than thirty (30) days' notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(xi)     Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender sustains or incurs (1) to the extent resulting from any default by Borrower in payment of the principal of, or interest on, a Benchmark Rate Loan, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by Lender in order to maintain such Benchmark Rate Loan, (2) as a consequence of any prepayment (whether voluntary or mandatory) of the Benchmark Rate Loan on a day that is not the last day of an Interest Rate Period, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Benchmark Rate Loan hereunder, and (3) as a consequence of the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Interest Rate from the Benchmark Rate to the Prime Rate with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the Benchmark

18

4885-3089-1555, v. 2

Rate on a date other than the last day of an Interest Rate Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a Benchmark Rate Loan hereunder (the amounts referred to in clauses (1), (2) and (3) are herein referred to collectively as the "Breakage Costs"); provided, however, Borrower shall not indemnify Lender from any loss or expense arising from Lender's willful misconduct or gross negligence.  This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(c)     In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable legal requirements, overdue interest in respect of the Loan, shall, at Lender's election, accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, without regard to any grace or cure periods contained herein.  Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect.

(d)     In the event of a conversion of the Loan from a Benchmark Rate Loan to a Prime Rate Loan, or vice versa, or the replacement of the then-applicable Benchmark with a Benchmark Replacement, Borrower shall pay to Lender, upon demand, any additional amounts necessary to compensate Lender for out-of-pocket costs and expenses in making such conversion or replacement in accordance with this Section 2.04.

Section 2.05   Usury Savings. This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required or obligated to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan shall, to the extent permitted by the applicable legal requirements, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.06. Term of the Loan.  All outstanding principal, accrued unpaid interest, and other sums due under the Loan Documents are due and payable in full on the Maturity Date.  All references herein to the Maturity Date shall mean the Initial Maturity Date, provided that Borrower shall have the right, subject to the satisfaction of all conditions precedent set forth herein, to extend the Maturity Date for two (2) additional terms of twelve (12) months each

(hereinafter respectively referred to as the "First Extension Option" and the "Second Extension Option"), thereby extending the Maturity Date to August 1, 2026 (hereinafter referred to as the "First Extended Maturity Date") and August 1, 2027 (hereinafter referred to as the "Second Extended Maturity Date"), respectively.

Section 2.07  First Extension Option.  Borrower may only exercise the First Extension Option if all of the following conditions precedent are satisfied to Lender's satisfaction:

(a)  No Default or Event of Default exists hereunder or under any of the other Loan Documents, and all of the representations and warranties of Borrower as set forth herein are materially true and correct, as reaffirmed in writing by Borrower;

(b)  Borrower shall have delivered to Lender written notice of its election to exercise the First Extension Option no earlier than ninety (90) days and no later than thirty (30) days prior to the Initial Maturity Date;

(c)  Borrower shall have paid to Lender an extension fee in an amount equal to one-quarter of one percent (0.25%) of the then outstanding Principal Sum of the Note (hereinafter referred to as the "First Extension Fee"), which First Extension Fee must be paid by Borrower to Lender with the written notice exercising such First Extension Option;

(d)  During the First Extended Term, the Benchmark Spread shall be increased to 3.75% per annum;

(e)  Borrower shall provide evidence to Lender, satisfactory to Lender in its sole discretion, that the Mortgaged Property is generating a minimum Debt Yield Ratio of not less than seven percent (7%); and

(f)  the Loan-to-Value Ratio, as of the commencement of the First Extended Term, shall not exceed seventy-two and one half of one percent (72.5%), as determined by Lender based on an updated Appraisal of the Mortgaged Property obtained by Lender at Borrower's expense.

Notwithstanding the foregoing, in the event that Borrower is unable to satisfy the conditions precedent set forth in subsections (e) and (f) above of this Section 2.07, Borrower shall have the right to make a prepayment of a portion of the Loan, in accordance with the provisions of Section 3.02 below, in an amount sufficient so that the conditions precedent as set forth in subsection (e) and (f) above are satisfied following the application of such prepaid principal amount.  Any such prepayment shall permanently reduce the principal amount of the Loan.

Section 2.08  Second Extension Option.  In the event that the First Extension Option is exercised in accordance with the provisions of Section 2.07 above, Borrower may only exercise

the Second Extension Option if all of the following conditions are satisfied to Lender's satisfaction:

       (a)     No Default or Event of Default exists hereunder or under any of the other Loan Documents, and all of the representation and warranties of Borrower as set forth herein are materially true and correct, as reaffirmed in writing by Borrower;

       (b)     Borrower shall have delivered to Lender written notice of its election to exercise the Second Extension Option no earlier than ninety (90) days and no later than thirty (30) days prior to the First Extended Maturity Date;

       (c)     Borrower shall have paid to Lender an extension fee in an amount equal to one-quarter of one percent (0.25%) of the then outstanding Principal Sum of the Note (hereinafter referred to as the "Second Extension Fee"), which Second Extension Fee must be paid by Borrower to Lender with the written notice exercising such Second Extension Option;

       (d)     During the Second Extended Term, the Benchmark Spread shall be increased to 4.00% per annum; and

       (e)     Borrower shall provide evidence to Lender, satisfactory to Lender in its sole discretion, that the Mortgaged Property is generating a minimum Debt Yield Ratio of not less than seven and one-half of one percent (7.5%).

       Notwithstanding the foregoing, in the event that Borrower is unable to satisfy the condition precedent set forth in subsection (e) above of this Section 2.08, Borrower shall have the right to make a prepayment of a portion of the Loan, in accordance with the provisions of Section 3.02 below, in an amount sufficient so that the condition precedent as set forth in subsection (e) above is satisfied following the application of such prepaid principal amount. Any such prepayment shall permanently reduce the principal amount of the Loan.

       Section 2.09 <u>Debt Yield Ratio Covenant</u>.  To the extent that the Term of the Loan has been extended for the First Extended Term and the Second Extended Term as provided above, the Mortgaged Property shall be required to maintain the minimum Debt Yield Ratio as set forth in Section 2.07(e) above during the entire First Extended Term, and shall be required to maintain the minimum Debt Yield Ratio as set forth Section 2.08(e) above during the entire Second Extended Term (the "Debt Yield Ratio Covenant"), with such Debt Yield Ratio Covenant being tested by Lender on a quarterly basis during the First Extended Term and the Second Extended Term. The failure of the Mortgaged Property to maintain the minimum Debt Yield Ratio Covenant during the applicable First Extended Term and Second Extended Term shall not constitute an Event of Default hereunder; provided, however, Borrower shall be precluded from making any distributions hereunder at any time during which such Debt Yield Ratio Covenant has not been satisfied. If the Mortgaged Property fails to achieve the minimum Debt Yield Ratio Covenant for two (2) consecutive calendar quarters during either the First Extended Term or the Second Extended Term, Borrower shall be required to make a payment of principal sufficient to

21

bring the Mortgaged Property in compliance with the required minimum Debt Yield Ratio Covenant and such principal amount may not be reborrowed. Thereafter, if the Mortgaged Property achieves the required minimum Debt Yield Ratio for two (2) consecutive calendar quarters, then, absent an Event of Default hereunder, any excess cash may be distributed by Borrower in accordance with the Borrower Operating Agreement.

ARTICLE 3
PAYMENTS

Section 3.01.  Required Payments.

(a)　Monthly Payments of Interest.  Interest for the period from the Closing Date through July 31, 2022, shall be due and payable on the Closing Date.  Beginning on September 1, 2022 and continuing on the first (1st) day of every calendar month thereafter, Borrower shall pay to Lender all interest, at the Applicable Interest Rate, accrued on the outstanding principal balance of the Loan and unpaid through the end of the previous month.

(b)　Mandatory Principal Payments – First Extended Term.  In addition to all interest payments due under Section 3.01(a) above, in the event that the Term of the Loan is extended for the First Extended Term as provided above, Borrower shall make monthly principal payments to Lender commencing on September 1, 2025 and continuing on the first day of each calendar month thereafter during the remaining portion of the Term until the First Extended Maturity Date.  The amount of each such payment shall be the principal portion of the level monthly payments of principal and interest that would be due in order to fully amortize ("mortgage style") over a period of thirty (30) years a loan in the amount of the outstanding Principal Sum of the Loan as of August 1, 2025, assuming a fixed interest rate equal to the greater of (i) five percent (5%) per annum or (ii) the actual Applicable Interest Rate in effect thirty (30) days prior to the Initial Maturity Date.

(c)　Mandatory Principal Payments – Second Extended Term.  In addition to all interest payments due under Section 3.01(a) above, in the event that the Term of the Loan is extended for the Second Extended Term as provided above, Borrower shall make monthly principal payments to Lender commencing on September 1, 2026 and continuing on the first day of each calendar month thereafter during the remaining portion of the Term until the Second Extended Maturity Date.  The amount of each such payment shall be the principal portion of the level monthly payments of principal and interest that would be due in order to fully amortize ("mortgage style") over a period of twenty-nine (29) years a loan in the amount of the outstanding Principal Sum of the Loan as of August 1, 2026, assuming a fixed interest rate equal to the greater of (i) five percent (5%) per annum or (ii) the actual Applicable Interest Rate in effect thirty (30) days prior to the First Extended Maturity Date.

(d)　Application of Monthly Payments.  Prior to an Event of Default, monthly payments shall be applied first to late fees or any other charges due hereunder or under any of the

22

other Loan Documents, including any protective advances made by Lender, then to accrued interest, with the balance in reduction of principal. Upon the occurrence and during the continuance of an Event of Default, payments hereon shall be applied upon the Loan in such order as Lender may elect in its sole discretion.

(e)     Place of Payment; No Set-Off or Deduction. All payments of principal, interest and fees shall be made to Lender at 8403 Colesville Road, Thirteenth Floor, Silver Spring, Maryland 20910 (or at such other place as Lender may from time to time in writing specify to Borrower) in immediately available and freely transferable funds at the place of payment on or before 2:00 p.m. (Eastern Time) on the date of payment. All payments shall be paid in full without setoff or counterclaim and without reduction for and free from any and all taxes, levies, imposts, duties, fees, charges, deductions, withholdings, restrictions or conditions of any nature imposed by any government or any political subdivision or taxing authority thereof.

Section 3.02. Voluntary Prepayments. The Loan shall not be prepayable during the period between the Closing Date and August 1, 2023. Thereafter, the Loan shall be prepayable only in full (except for partial prepayments in accordance with the provisions of Section 2.07 and/or Section 2.08 above), upon at least thirty (30) days prior written notice.

Section 3.03. Premium Due Upon Default. Upon the occurrence of an Event of Default and the acceleration of the outstanding principal balance of the Note in accordance with the terms and provisions of this Agreement, any unscheduled payment of the outstanding principal balance of the Note which shall be made to Lender as a result of, or as a consequence of, or in connection with, such acceleration, must include a premium equal to the greater of five percent (5%) of the outstanding principal balance of this Note or the Yield Maintenance Amount (as that term is hereinafter defined), if the payment is tendered during any period in which prepayment is prohibited pursuant to Section 3.02 above. The term "Yield Maintenance Amount", as used herein, shall mean an amount equal to the difference between:

(a)     the amount determined by discounting all scheduled payments of principal and interest, plus any balloon payments if applicable, remaining to the Maturity Date at the stated yield to maturity of a United States Treasury bond and/or note having a similar duration as reported in The Wall Street Journal five (5) Business Days prior to the prepayment date; and

(b)     the sum of the outstanding principal balance of the Note plus all accrued and unpaid interest, if any, calculated as of the prepayment date.

Section 3.04. Late Charge. A late payment premium of six percent (6%) of the unpaid portion of any monthly payment due under this Agreement shall be due in the event such required payment shall not be made on or before the fifth (5th) day after its due date. No such late payment shall apply for amounts due on the Maturity Date or upon acceleration of the Loan.

Section 3.05. No Reborrowing.  Any part of the Loan advanced by Lender and subsequently repaid may not be reborrowed.

Section 3.06. Loan Commitment Fee.  On or before the Closing Date, Borrower shall pay to Lender the Loan Commitment Fee.  The Loan Commitment Fee shall be deemed to be fully earned by Lender as of the Closing Date and shall be non-refundable.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the date hereof that:

Section 4.01.   Organization and Qualification.   Borrower is (i) a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and (ii) authorized and empowered to own, sell, develop and deal in real and personal property in the State of Ohio.  Sole Member is (i) a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio, and (ii) authorized and empowered to act as the sole member of Borrower.  Managing Member is (i) a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio, and (ii) authorized and empowered to act as the managing member of Sole Member.

Section 4.02.   Power and Authority.   Borrower and Guarantor have the power and authority to execute and deliver the Loan Documents.

Section 4.03.   Conflict with Other Documents, Law, Etc. Neither the execution and delivery by and on behalf of Borrower of this Agreement or the Loan Documents, nor the consummation of the transactions herein or therein contemplated, nor the compliance with the terms and provisions hereof or thereof (i) will conflict with or result in a breach of any of the terms, conditions or provisions of any of the organizational documents of Borrower, or any law; or (ii) will (in any manner which individually or in the aggregate is materially adverse to the financial condition, business or operations of Borrower), conflict with or result in a breach of any of the terms, conditions or provisions of any Governmental Requirement or any other agreement or instrument to which Borrower is a party or by which it is bound or to which it is subject, or constitute a default thereunder or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its properties pursuant to the terms of any such other agreement or instrument.

Section 4.04. Authorization, Validity and Binding Effect. The execution and delivery by and on behalf Borrower of this Agreement and the Loan Documents, the making of the borrowings contemplated by the provisions of this Agreement, the execution, issuance and delivery of the Note to evidence such borrowings and the other Loan Documents to secure repayment of and support such borrowings and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Borrower, Sole Member and Managing Member, and this Agreement has been

24

duly and validly executed and delivered by Borrower and constitutes the valid and legally binding contract of Borrower enforceable in accordance with its terms, subject to bankruptcy, insolvency and other limitations on creditors' rights generally and to equitable principles; and the Note, the other Loan Documents and the other documents, instruments and agreements contemplated hereby, when duly executed and delivered by Borrower and Guarantor pursuant to the provisions hereof or thereof, will constitute the valid and legally binding obligations of Borrower and Guarantor enforceable in accordance with the terms thereof and of this Agreement.

Section 4.05.    Financial Condition. The financial condition of Borrower and Guarantor as of the date of the financial statements most recently provided to Lender is fairly presented in accordance with GAAP or other Approved Accounting Principles consistently applied in the financial statements of Borrower and Guarantor heretofore presented to Lender.

Section 4.06.    No Material Adverse Change.  Since the date of the financial statements referred to in Section 4.05 above, there has been no material adverse change in the financial condition of Borrower or Guarantor, which would in any case materially impair any of their respective abilities to perform their respective obligations under the Loan Documents.

Section 4.07.    Regulation U.  Borrower is not engaged, principally or as one of its important activities, in the business of purchasing or carrying "margin stock" (as that term is defined in Regulation U promulgated by the Board of Governors of the Federal Reserve System), nor of extending to others for the purpose of purchasing or carrying such margin stock.

Section 4.08.    Litigation.  There are no actions, suits, or proceedings pending, or to the knowledge of the parties hereto threatened, against or affecting Borrower, Guarantor or the Mortgaged Property, or involving the validity or enforceability of the Mortgage or the priority of the lien thereof, at law or in equity, or before or by any Governmental Authority except actions, suits and proceedings fully covered by insurance or which could not reasonably be expected to substantially impair the ability of Borrower or Guarantor to perform any of their respective other material obligations under the Loan Documents.

Section 4.09.    Utilities.  All utility services necessary for the operation of the Building and Mortgaged Property are available at the boundaries of the Mortgaged Property, including water, sanitary and storm sewer, electric and gas; and such utilities enter the Mortgaged Property through adjoining public streets, or, if any pass through adjoining private lands, they do so in accordance with valid easements.

Section 4.10.    Title to Collateral.   Borrower has good and marketable title to the Mortgaged Property, free and clear of any liens, claims, encumbrances or security interests, except for the Permitted Exceptions, and Borrower will defend such title against the claims and demands of all persons except as above stated.

Section 4.11.    Defaults.  No Event of Default has occurred and is continuing or exists.

25

Section 4.12. Representations.

A.      Neither the Building nor any part thereof is now damaged or injured as a result of any fire, explosion, accident, flood or other casualty.

B.      To the best of Borrower's Knowledge, no condemnation or adverse zoning or usage change proceeding has been commenced or threatened with respect to the Mortgaged Property.

C.      To the best of Borrower's Knowledge, no Governmental Authorities have done any work on the Mortgaged Property, nor made a demand that such work be done, that may result in charges by any Governmental Authorities.

D.      To the best of Borrower's Knowledge, there are no unpaid fees for inspection, permits, examinations, services, sign, boiler or other charges that have been levied, charged, created or incurred that may become a tax or other lien against the Mortgaged Property under any applicable statute, rule, regulation, ordinance or law that are currently due and payable.

Section 4.13. Flood Area; Hazardous Waste.  The Mortgaged Property is not in an "area of special flood hazard", as that term is defined in the National Flood Insurance Act of 1968.  To the best of Borrower's Knowledge and except as set forth in the Phase I Report, the Mortgaged Property does not contain any Hazardous Materials in violation of Environmental Laws (as that term is defined in the Environmental Indemnity).

Section 4.14.    Offsets and Defenses.  Borrower has no offsets or defenses with respect to payment of the Loan.

Section 4.15.    Brokers.  Borrower has dealt with no broker in connection with the transactions contemplated by this Agreement, other than Berkadia Commercial Mortgage.  It is understood and agreed that Lender assumes no obligation for the payment of any brokerage fee or commission in connection with the Loan, and that Borrower will and hereby does indemnify and hold Lender harmless against any claim for any such brokerage fee or commission.

Section 4.16.    Tax Returns and Taxes.  Borrower has filed all federal, state and local tax returns and other reports it was required by law to file prior to the date hereof and which were material to the conduct of its business, has paid or caused to be paid, or will pay simultaneously with closing hereunder, all taxes, assessments and other governmental charges that were due and payable prior to the date hereof, and has made adequate provision in its financial statements for the payment of such taxes, assessments and other charges accruing but not yet paid or payable. Borrower has no knowledge of any deficiency or additional assessment in connection with any taxes, assessments or charges which is not properly provided for on its books.

Section 4.17. ERISA

26

A.      None of the Borrower Parties is (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA, (ii) a "plan" as defined by and subject to Section 4975 of the Internal Revenue Code, or (iii) an entity deemed to hold "plan assets" (within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA) of either (i) or (ii).

B.      Each Borrower Party agrees to execute such documents or provide such information as Lender may require in connection with the transaction contemplated under this Agreement (the "Transaction") or to otherwise assure Lender that the Transaction is not a prohibited transaction under ERISA and that Lender is not in violation of ERISA by compliance with this Agreement and by closing the Transaction.  Each Borrower Party acknowledges and agrees that Lender shall not be obligated to consummate the Transaction unless and until Lender is satisfied that the Transaction complies in all respects with ERISA, and that this representation shall survive the consummation of the Transaction and shall not be merged therein.

C.      None of the Borrower Parties is a party in interest as defined in Section 3(14) of ERISA with respect to any employee benefit plan that is an investor in Separate Account J other than (i) by reason of providing services, including fiduciary services, to the plan, or (ii) by reason of a relationship to a plan service provider described in Section 3(14)(F), (G), (H), or (I) of ERISA;

D.      No Borrower Party exercises discretionary authority, control, responsibility, or influence with respect to the investment of the plan assets in Separate Account J;

E.      No Borrower Party has discretionary authority, control, responsibility, or influence with respect to the management or disposition of the plan assets held in Separate Account J;

F.      No Borrower Party is an "affiliate" of The Union Labor Life Insurance Company within the meaning of Section IV(b) of Prohibited Transaction Exemption 90-1 ("PTE 90-1");

G.      Each Borrower Party agrees that the Transaction satisfies the conditions of Section III(a) of PTE 90-1 and that Lender will receive no less and pay no more than fair market value in connection with the Transaction within the meaning of Section 408(b)(17)(B)(ii) of ERISA; and

H.      No Borrower Party nor any of their Affiliates is a fiduciary who has or exercises any discretionary authority or control with respect to the investment of Separate Account J's plan assets involved in the Transactions or renders investment advice (within the meaning of Section 3(21)(A)(ii) of ERISA) with respect to those assets, within the meaning of Section 408(b)(17) of ERISA.

27

4885-3089-1555, v. 2

Section 4.18. <u>Single Purpose Entity</u>.

     A.     Borrower is a Single Purpose Entity.

     B.     Borrower will comply with the provisions of its organizational documents and the laws of its jurisdiction of formation.

     C.     All customary formalities regarding the existence of Borrower will continue to be observed.

     D.     Borrower will accurately maintain its financial statements, accounting records and other partnership documents, separate from those of any Affiliates and any other Person.  Borrower will not commingle its assets with those of any other Affiliates or any other entity or person.  Borrower will accurately maintain its own bank accounts, payroll and separate books of account.

     E.     Borrower will pay its own liabilities from its own separate assets.

     F.     Borrower shall identify itself, in all dealings with the public, under its own name and as a separate and distinct entity; (ii) Borrower will not identify itself as being a division or a part of any other entity; and (iii) Borrower will not identify any Affiliates as being a division or part of Borrower.

     G.     Borrower is currently and will continue to be adequately capitalized in light of the nature of its business but only to the extent there is sufficient Net Operating Income from the Mortgaged Property (and the foregoing shall not require any direct or indirect equity owners of Borrower to make any loans or capital contributions to Borrower).

     H.     Except in connection with the Loan from Lender, Borrower will not assume or guarantee the liabilities of any Affiliates or any other entities or persons except as permitted by or pursuant to this Agreement.  Borrower will not acquire obligations or securities of any Affiliates or other entities or persons.  Borrower will not make loans or advances to any Affiliates.

     I.     Borrower will not enter into or be a party to, any transaction with any Affiliates, except in the ordinary course of business of Borrower, on terms which are no less favorable to Borrower than would be obtained in a comparable arm's length transaction with an unrelated third party.

Section 4.19.  <u>General Validity</u>.  No representation or warranty by Borrower or Guarantor contained herein or in any other Loan Document furnished by Borrower and/or Guarantor contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make such representation or warranty not misleading in light of

28

the circumstances under which it was made. The projections and pro forma financial information (the "Projections") included in such materials are based upon good faith estimates and assumptions believed by Borrower to be reasonable at the time made; it being recognized by Lender that such Projections as to future events are not to be viewed as fact and that actual results during the period or periods covered by the projections may differ from such projected results and such differences may be material

## ARTICLE 5
## CONDITIONS PRECEDENT

The obligation of Lender to enter into this Agreement and to make the Loan hereunder is subject to compliance by Borrower with all of the conditions set forth in the Loan Application and to the following conditions precedent:

Section 5.01. Closing Date. Lender shall have received on or prior to the Closing Date:

A.     Title Insurance. The Title Policy (or acceptable pro forma title policy) issued by the Title Insurer, insuring the Mortgage in an aggregate face amount equal to the face amount of the Note as a valid first lien on Borrower's fee interest in the Mortgaged Property, free and clear of all liens, charges and encumbrances, including mechanics liens, except for the Permitted Exceptions.

B.     Loan Documents. The Loan Documents and any other documents required to be delivered pursuant to the Loan Application, duly executed by Borrower, Lender and Guarantor, and evidence satisfactory to Lender that the Mortgage and the Assignment of Leases have been or will be duly recorded in the appropriate recording office in the County of Cuyahoga, Ohio and that all Financing Statements have been appropriately filed.

C.     Governmental Requirements. Evidence that (i) all permits, licenses and approvals required by any Governmental Authority for the operation of the Mortgaged Property have been issued or are available, and (ii) the Mortgaged Property is satisfactorily zoned for the existing uses thereof.

D.     Insurance. Certificates and/or copies of all policies of insurance required to be maintained by Borrower pursuant to the requirements of Article 6 below, together with evidence of payment of the premiums therefor.

E.     Authority. The following evidence of the authority of Borrower to enter into the transactions contemplated hereby:

1.     A certified true and correct copy of the Borrower Operating Agreement.

4885-3089-1555, v. 2

2.      A certified copy of Borrower's Certificate of Formation and all amendments thereto, as filed with the Secretary of State of the State of Delaware.

3.      Good Standing Certificate for Borrower, as issued by the Secretary of State of the State of Delaware.

4.      A certified copy of Borrower's registration as a foreign limited liability company, as filed with the Secretary of State of the State of Ohio.

5.      Good Standing Certificate for Borrower, as issued by the Secretary of State of the State of Ohio.

6.      A certified true and correct copy of Sole Member's operating agreement and all amendments thereto.

7.      A certified copy of Sole Member's Articles of Organization and all amendments thereto, as filed with the Secretary of State of the State of Ohio.

8.      Full Force and Effect Certificate for Sole Member, as issued by the Secretary of State of the State of Ohio.

9.      A certified true and correct copy of Managing Member's operating agreement and all amendments thereto.

10.     A certified copy of Managing Member's Articles of Organization and all amendments thereto, as filed with the Secretary of State of the State of Ohio.

11.     Full Force and Effect Certificate for Managing Member, as issued by the Secretary of State of the State of Ohio.

12.     Consents of the members and/or managing members of Borrower, Sole Member and Managing Member, as applicable, authorizing the execution and delivery of the Loan Documents.

F.      Opinions of Counsel.  Opinions of counsel for Borrower, Sole Member, Managing Member and Guarantor in form and content reasonably satisfactory to Lender and Lender's counsel.

G.      Appraisal.  A written Appraisal, satisfactory in form and content to Lender.

H.      Financial Statements.  Certified true and correct copies of the financial statements of Borrower and Guarantor.

30

I.      Affidavits of No Material Adverse Change.  Affidavits of No Material Adverse Change, as reasonably approved by Lender's counsel and duly executed by Borrower and Guarantor.

J.      Rent Roll.  A certified rent roll, in form and content acceptable to Lender, identifying all Commercial Leases and Residential Leases with respect to the Mortgaged Property.

K.      Commercial Leases.  Fully executed copies of all Commercial Leases with respect to the Building.

L.      SNDAs and Estoppels.  Subordination, Non-Disturbance and Attornment Agreements and Estoppels, in form and content reasonably acceptable to Lender, executed by Borrower and by tenants under Commercial Leases.

ARTICLE 6
INSURANCE, CONDEMNATION, AND IMPOUNDS

Section 6.01. Insurance.  Lender shall require that Borrower maintain the following insurance throughout the term of the Loan:

A.      Property. With respect to the Building at all times during the term of this Loan:

1.      All Risk/Special Perils Insurance.  Insurance against loss customarily included under so called "All Risk" or "Causes of Loss - Special Form" policies with limits equal to 100% of the replacement cost value of the Building including 100% of the insurable replacement cost value of all tenant improvements and betterments that any agreement requires Borrower to insure, and against all risks of loss to the Building customarily covered by so-called "Cause of Loss – Special Form" policies as available in the insurance market. Coverage shall include, but not be limited to the following perils: loss by collapse, fire, flood, back-up of sewers and drains, water damage, windstorm, named storm, earthquake, acts of terrorism, impact of vehicles and aircraft, lightning, malicious mischief, and vandalism (earthquake and flood may have a sub-limit of such amount as is acceptable to Lender), and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. Such insurance policy shall also insure costs of demolition and increased cost of construction including increased costs arising out of changes in applicable laws and codes and operation of building laws, with a sub-limit acceptable to Lender. Each such insurance policy shall contain an agreed amount endorsement or a waiver of coinsurance and provides for replacement cost valuation. Such insurance policy shall name Borrower as the Insured and shall also name Lender as Mortgagee under a non-contributing New York standard mortgagee clause or equivalent endorsement satisfactory to Lender for real property and as Lender Loss Payee as respects business income/loss of rents.

31

2.      Flood Insurance. If any of the Building is at any time located in an area designated as "flood prone" or a "special flood hazard area" under the regulations for the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, and if not otherwise insured under coverage required above, Borrower shall maintain at least the maximum coverage for the Building available under the federal flood insurance plan. Lender may require additional flood insurance coverage, and loss of income or rents.

3.      Boiler and Machinery. Mechanical Breakdown (Comprehensive Boiler and Machinery) insurance covering all mechanical and electrical equipment against physical damage, rent loss and Building loss and covering, without limitation, all tenant improvements and betterments that Borrower is required to insure on a replacement cost basis, with no coinsurance, in the minimum amount and terms acceptable to Lender.

4.      Business Income and Rent Loss Insurance. As an extension to its Cause of Loss – Special Form Insurance, Earthquake Insurance, Flood Insurance and Boiler and Machinery Insurance, Borrower shall maintain business income and rent loss insurance (if applicable) on an "actual loss sustained" basis, subject to the applicable policy limit. Borrower shall maintain Business Income and Rent Loss Insurance equal to at least twenty four (24) months of the actual or projected gross operating income, including percentage rent, escalations, and all other recurring sums payable by tenants under Leases or otherwise derived from the operation of the Building. In addition, Business Income and Rent Loss Insurance shall be endorsed to include an extended period of indemnity of three hundred sixty-five days (365) days.

5.      Liability Insurance. Borrower shall maintain the following insurance for personal injury, bodily injury, death, accident and property damage: (i) public liability insurance, including commercial general liability insurance, with limits no less than $1,000,000 each occurrence and $2,000,000 aggregate, per location; (ii) owned (if any), hired, and non-owned automobile liability insurance, with a minimum combined single limit of $1,000,000; (iii) statutory workers' compensation and employer's liability insurance as required by law, and (iv) umbrella/excess liability insurance, with limits no less than $15,000,000 per occurrence and in the annual aggregate. Liability insurance shall be in the so-called "occurrence" form. Liability Insurance shall include coverage for liability arising from premises and operations, elevators, escalators, independent contractors, contractual liability (including, without limitation, any liability assumed under any Leases), and products and completed operations. All Liability Insurance shall name Lender as an "Additional Insured" by an endorsement satisfactory to Lender. Notwithstanding the foregoing to the contrary, Lender hereby approves Borrower's liability insurance coverage in place as of the date hereof; provided however, that Borrower shall, within thirty (30) days after the Closing Date, provide evidence to Lender that Borrower has obtained liability insurance coverage as required pursuant to this provision. In the event that Borrower fails to provide such evidence of liability insurance as required herein within thirty (30) days after the Closing Date, during any period thereafter that Borrower is not in compliance with these requirements, Lender shall have the right to increase

32

the Benchmark Spread to five percent (5%) until such time as Borrower shall have provided evidence of liability insurance coverage as required pursuant to this provision.

        B.     At all times during the term of the Agreement, Borrower shall maintain:

        1.     <u>Workers Compensation; Disability</u>.  Workers Compensation and Disability insurance as required by law.

        2.     <u>Other Insurance</u>.  Such other types and amounts of insurance with respect to the Mortgaged Property and the operation thereof that are commonly maintained in the case of other property and buildings similar to the Mortgaged Property in nature, use, location, height, and type of construction, as may from time to time be required by Lender.

        C.     <u>Form and Quality of Insurance Policies</u>.

        1.     All insurance policies shall be issued by an insurer or insurers with an A.M. Best Rating of "A:IX" or better and other equivalent rating from another agency acceptable to Lender.

        2.     Borrower shall provide or cause the Insurer(s) to provide Lender not less than thirty (30) days prior written notice of cancellation of the policy(ies) (except ten (10) days' notice for non-payment of premium) or of the non-renewal thereof.  Borrower shall not cause or permit any insurer to modify any required insurance coverages, limits of insurance, terms or conditions such that the effect of the modification results in non-compliance with the insurance requirements herein.  Each policy shall provide that no act or thing done by Borrower shall invalidate any policy.  If Borrower fails to maintain insurance in compliance with this Article 6, Lender may obtain such insurance and pay the premium therefor and Borrower shall, within ten (10) Business Days after written demand setting forth the amount due, reimburse Lender for all expenses incurred in connection therewith.  Borrower shall assign the policies or proofs of insurance to Lender, in such manner and form that Lender and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan.  The proceeds of insurance policies coming into the possession of Lender shall not be deemed trust funds, and Lender shall be entitled to apply such proceeds as herein provided.

        3.     The Property and Boiler and Machinery insurance policies shall name Lender under a non-contributing New York standard mortgagee clause or an equivalent endorsement in form and content.

        4.     All insurance policies shall contain coverage for tenant improvements and betterments that Borrower is required to insure. The amount of any deductible under any insurance policy shall not exceed $50,000 or such other amount acceptable to Lender. Without Lender's prior written consent, Borrower shall not name any person other than Lender as Mortgagee/lender loss payee as respects the Building, nor shall Borrower carry separate or additional insurance coverage covering the Building concurrent in form or contributing in the

33

event of loss with that required by this Agreement; provided that, if blanket policies are obtained, this sentence shall not apply to property covered by such blanket policies other than the Building and such tenant improvements and betterments that Borrower is required to insure pursuant to this Loan.

5.     Borrower shall pay the premiums for the insurance policies as the same become due and payable.  Borrower shall deliver copies of all original policies certified to Lender by the insurance company or authorized agent as being true copies, together with the endorsements required hereunder. Lender shall not be deemed by reason of the custody of such insurance policies to have knowledge of the contents thereof.  Borrower also shall deliver to Lender, within ten (10) days of Lender's request, a certificate of Borrower or its insurance agents setting forth the particulars as to all such insurance policies, that all premiums due thereon have been paid and that the same are in full force and effect.  Not later than fifteen (15) days prior to the expiration date of each of the insurance policies, Borrower shall deliver to Lender a certificate of insurance evidencing renewal of coverage as required herein.  Not later than ninety (90) days after the renewal of each of the insurance policies, Borrower shall deliver to Lender an original or certified copy (as required pursuant to this paragraph of a renewal policy or policies. Within ten (10) days after such renewal, Borrower shall deliver to Lender evidence of payment of premium satisfactory to Lender.

6.     Each insurance policy shall contain a provision whereby the insurer: (i) waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (ii) provides that Lender is permitted to make payments to effect the continuation of such policy upon Notice of Cancellation due to non-payment of premiums.

7.     In the event that any insurance policy (except for General Public and other liability and Workers Compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (i) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (ii) the occupancy or use of the Mortgaged Property for purposes more hazardous than permitted by the terms thereof, or (iii) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of this Agreement or any of the Loan Documents.

8.     Any insurance maintained pursuant to this Section 6.01 may be evidenced by blanket insurance policies covering the Mortgaged Property and other properties or assets of Borrower or its Affiliates, provided that any such policy shall in all other respects comply with the requirements of this Section 6.01. Lender, in its sole discretion, shall determine whether such blanket policies provide sufficient limits of insurance.

9.     Borrower shall not take out (1) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.01 to be furnished by, or

34

which may be reasonably required to be furnished by, Borrower, or (2) any umbrella or blanket liability or casualty policy unless, in each case, Lender is included therein as an insured, with loss payable as in this Agreement provided.  Borrower shall immediately notify Lender of the taking out of any such separate insurance or umbrella or blanket policy by Borrower and shall cause the policies therefor to be delivered as required in this Section 6.01.  Any blanket insurance policy shall specifically allocate to the Mortgaged Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate policy insuring only the Mortgaged Property in compliance with the provisions of this Section 6.01.

10.     All policies of insurance provided for or contemplated by this Section 6.01 shall name Lender and Borrower, as applicable, as the insured or additional insured, as their respective interests may appear, and in the case of Property and Boiler and Machinery insurance, shall name Lender as the party to receive all proceeds of insurance derived for claims for damage to the improvements and business income or rental income on a so-called New York standard mortgagee clause or its equivalent in favor of Lender providing that the loss thereunder shall be payable to Lender.

11.     All policies of insurance provided for in this Section 6.01 hereof shall contain clauses or endorsements to the effect that:

(i)      no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant under any Lease or other occupant or failure to comply with the provisions of any policy which might otherwise result in a forfeiture of such insurance or any part thereof shall in any way affect the validity or enforceability of such insurance insofar as Lender is concerned;

(ii)     such policies shall not be materially changed (other than to increase the coverage provided thereby), cancelled or non-renewed without at least thirty (30) days' written notice to Lender and any other party named therein as an insured thereunder; and

(iii)    Lender shall not be liable for any premiums thereon or subject to any assessments thereunder.

D.     <u>Adjustments</u>.  Borrower shall give immediate written Notice of any loss as to which Borrower is making an insurance claim to the insurance carrier and to Lender.  From and after the occurrence of any Event of Default (other than as a direct result of the damage or destruction giving rise to the payment of the insurance proceeds), Borrower hereby irrevocably authorizes and empowers Lender, as attorney-in-fact for Borrower, coupled with an interest, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds.  Nothing contained in this Section 6.01(D), however, shall require Lender to incur any expense or take any action hereunder.

35

Section 6.02. <u>Use and Application of Insurance Proceeds</u>.

A.    If by reason of any damage or destruction, any insurance proceeds are paid under any insurance policy maintained pursuant to Section 6.01 hereof or otherwise (other than business interruption insurance proceeds or, as the case may be, rental loss insurance proceeds, which shall be held in trust by Lender and applied to the payment of the Loan hereunder), such insurance proceeds shall be paid over to Lender, unless the damage or destruction qualifies as a Covered Casualty (as hereinafter defined) and the cost of repair or restoration of the damage or destruction are reasonably estimated by Borrower and the insurance adjuster to be less than $100,000, in which case (so long as an Event of Default does not then exist hereunder) such insurance proceeds will be paid to (or may retained by) Borrower so long as Borrower promptly commences and diligently performs the repair or restoration.  In the event that any such damage or destruction qualifies as a Covered Casualty, and provided that no Event of Default exists hereunder (other than as a direct result of the damage or destruction giving rise to the payment of the insurance proceeds), Lender shall, upon written request by Borrower, apply such insurance proceeds to the repair and restoration of the Mortgaged Property in accordance with the terms and conditions hereinafter set forth.  In the event that such damage or destruction does not qualify as a Covered Casualty, Lender may elect, in its sole discretion, to (1) apply such insurance proceeds to the payment of the Loan, without prepayment premium or penalty, whether or not then matured, in such order and priority as Lender shall determine in its sole discretion or (2) apply the same to the repair and restoration of the Mortgaged Property upon the terms and conditions hereinafter set forth.  In the event that such insurance proceeds are applied to the payment of the Loan, any surplus proceeds remaining after the payment in full of the Loan shall be delivered to Borrower or any other party legally entitled thereto.

B.    For purposes hereof, a "Covered Casualty" shall be damage or destruction to the Mortgaged Property which satisfies all of the following conditions precedent: (i) the cost of restoration shall not exceed $5,000,000.00, as reasonably determined by Lender, (ii) such casualty does not result in cancellation of Leases covering more than twenty percent (20%) of the rentable area of the Mortgaged Property, (iii) the restoration of the Mortgaged Property is reasonably expected to be completed at least six (6) months prior to the Maturity Date, (iv) Borrower has obtained all necessary consents and approvals to restore the Mortgaged Property to the condition substantially similar to the condition existing prior to the occurrence of such casualty, and (v) the insurance proceeds shall be sufficient to fully restore the Mortgaged Property to the condition substantially similar to the condition existing prior to occurrence of such casualty, or, if such insurance proceeds are insufficient, as reasonably determined by Lender, Borrower shall have deposited with Lender funds (or demonstrated to Lender, in its sole discretion, the immediate and unencumbered availability of funds) which, when added to the insurance proceeds received by Lender, are sufficient to complete the restoration of the Mortgaged Property.

C.    If Lender is obligated to or permits the insurance proceeds to be used for the restoration of the Mortgaged Property, such insurance proceeds applied to restoration will be

36

disbursed on receipt of satisfactory plans and specifications, contracts and subcontracts, schedules, budgets, lien releases and architects' certificates, and otherwise in accordance with prudent commercial construction lending practices for construction loan advances (including deposits required in connection with any such contract or subcontract).

Section 6.03. <u>Condemnation Awards</u>. Borrower shall promptly notify Lender of the institution of any proceeding for the condemnation or other taking of the Mortgaged Property or any portion thereof. Lender may participate in any such proceeding and Borrower will deliver to Lender all instruments necessary or required by Lender to permit such participation. Without Lender's prior consent, which consent shall not be unreasonably withheld, Borrower (1) shall not agree to any compensation or award, and (2) shall not take any action or fail to take any action which would cause the compensation to be determined. All awards and compensation for the taking or purchase in lieu of condemnation of the Mortgaged Property or any part thereof are hereby assigned to and shall be paid to Lender. Borrower authorizes Lender to collect and receive such awards and compensation, to give proper receipts and acquittances therefor, and in Lender's sole and reasonable discretion, to apply the same toward the payment of the Loan, notwithstanding that the Loan may not then be due and payable, or to the restoration of the Mortgaged Property. Borrower, upon request by Lender shall execute all instruments requested to confirm the assignment of the awards and compensation to Lender, free and clear of all liens, charges or encumbrances.

Section 6.04. <u>Tax and Insurance Escrow Account</u>. Borrower shall deposit with Lender, on a monthly basis, one-twelfth (1/12th) of the real estate taxes, assessments and similar charges relating to the Mortgaged Property, and insurance premiums. All funds so deposited shall be held by Lender, without interest, and may be commingled with Lender's general funds. Borrower hereby grants to Lender a security interest in all funds so deposited with Lender for the purpose of securing the Loan. While an Event of Default exists, the funds deposited may be applied in payment of the charges for which such funds have been deposited, or to the payment of the Loan or any other charges due under this Agreement or any of the other Loan Documents, as Lender may elect, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender. Borrower shall furnish Lender with bills for the charges for which such deposits are required at least thirty (30) days prior to the date on which the charges are due and payable without penalty. If at any time the amount on deposit with Lender, together with amounts to be deposited by Borrower before such charges are due and payable without penalty, is insufficient to pay such charges, Borrower shall deposit any deficiency with Lender immediately upon demand. Lender shall promptly pay such charges when the amount on deposit with Lender is sufficient to pay such charges and Lender has received a bill for such charges.

ARTICLE 7
FINANCIAL REPORTING

Section 7.01. <u>Reports</u>. Borrower shall keep or maintain or will cause to be kept and maintained, in accordance with consistently applied GAAP (or other Approved Accounting

37

Principles consistently applied), complete and accurate books, accounts and records reflecting all of the financial affairs of Borrower, including, without limitation, earnings and expenses in connection with any services, equipment or furnishings provided in connection with the operation of the Mortgaged Property, and, without expense to Lender, shall deliver to Lender within ninety (90) days after the end of each year, (i) annual financial statements (balance sheet and income statement) for the Mortgaged Property, and (ii) annual financial statements (balance sheet, income statement and cash flow statement) for Borrower, as reviewed by a certified public accountant. Borrower shall also deliver to Lender, within ninety (90) days of each calendar year end, a rent roll for the Mortgaged Property in form and content reasonably acceptable to Lender. In addition to the foregoing, on a quarterly basis, within thirty (30) days after the end of each Calendar Quarter, quarterly operating statements for the Mortgaged Property, all of which shall be in form and content reasonably acceptable to Lender.

Section 7.02. Certification. The financial statements shall be accompanied by a certificate of Borrower dated as of the delivery of such statements to Lender, stating that, to the best of Borrower's Knowledge, (a) such statements are true, correct, complete, and not misleading in any material respect and such statements, as a whole, fairly present the financial position of Borrower at the end of such fiscal year; and (b) no Event of Default has occurred and is continuing, or, if any such Event of Default is continuing, specifying the nature and period of existence thereof and what action Borrower has taken or proposes to take with respect thereto.

Section 7.03. Financial Statements of Guarantor. Borrower shall cause Guarantor to deliver to Lender, not later than ninety (90) days after the end of each year during the term of the Loan, current financial statements for Guarantor prepared in accordance with GAAP consistently applied (or other Approved Accounting Principles consistently applied), as reviewed by a certified public accountant and certified by Guarantor as true, correct, complete and not misleading in any material respect.

Section 7.04. Tax Returns. Borrower shall furnish or cause to be furnished to Lender, within thirty (30) days after the same is filed, a copy of the signed federal income tax returns of Borrower and Guarantor.

Section 7.05. Environmental Matters. Borrower shall deliver to Lender within seven (7) days of Borrower's receipt thereof a copy of any written communication received after the date hereof by Borrower, Guarantor, or any Affiliate thereof, from any Person concerning the presence or possible presence of any Hazardous Material on any portion of the Mortgaged Property in violation or alleged violation of any Environmental Laws, or otherwise concerning any violation or alleged violation of any Environmental Law.

Section 7.06. Accounting Principles. All financial statements required hereunder shall be prepared in accordance with GAAP, consistently applied from year to year (or other Approved Accounting Principles consistently applied).

4885-3089-1555, v. 2

Section 7.07. <u>Other Information</u>. Borrower shall deliver to Lender such additional information regarding Borrower, Guarantor and the Mortgaged Property as may be reasonably requested by Lender within thirty (30) days after Lender's request therefor.

Section 7.08. <u>Audits</u>. Lender shall have the right to choose and appoint a certified public accountant to perform financial audits as it deems necessary with respect to the operating statements of the Mortgaged Property, at Lender's expense; provided, however, that if an error in excess of two percent (2%) of the Net Operating Income is discovered, whether favorable or unfavorable to Borrower, the cost of the audit shall be borne by Borrower.  In addition, upon the occurrence and during the continuance of an Event of Default, Lender, in its discretion, may require that the operating statements for the Mortgaged Property and the financial statements for Borrower and Guarantor to be audited by an independent certified public accountant, at Borrower's expense.  Borrower shall permit Lender to examine such records, books and papers of Borrower which reflect upon its financial condition and the income and expense relative to the Mortgaged Property.

Section 7.09. <u>Access</u>. Lender and any of its officers, employees and/or agents shall have the right, exercisable as frequently as Lender reasonably determines to be appropriate, during normal business hours (or at such other times as may reasonably be requested by Lender), to inspect the properties and facilities of Borrower and (on 48 hours' prior Notice, which may be oral) to inspect, audit and make extracts from all of Borrower's records, files and books of account.  Lender shall use commercially reasonable efforts to minimize any interruption to the operations of Borrower and any tenants of the Mortgaged Property in connection with any access to the Mortgaged Property as provided herein. Borrower shall deliver any document or instrument reasonably necessary for Lender, as Lender may request, to obtain records from any service bureau maintaining records for Borrower, and shall maintain duplicate records or supporting documentation on media, including, without limitation, computer discs owned by Borrower.  At Lender's request, Borrower shall instruct their respective banking and other financial institutions to make available to Lender such information and records as Lender may reasonably request.

Section 7.10. <u>Principal Sum Increased</u>. The outstanding principal balance of the Note shall be increased by Two Thousand and No/100 Dollars ($2,000.00) upon each failure of Borrower or Guarantor to deliver each financial statement, certificate, document, statement or summary required in this Article 7 in accordance with the provisions set forth herein, which failure continues for ten (10) Business Days after Notice thereof from Lender.

ARTICLE 8
COVENANTS

Borrower covenants and agrees with Lender as follows:

Section 8.01. <u>Due on Sale and Encumbrance; Transfers of Interests</u>. Except for "Permitted Transfers" (defined below), Borrower hereby covenants and agrees that it will not,

39

without the prior written consent in each instance of Lender, which may be withheld in its sole discretion, (i) convey, sell, assign, lease or otherwise transfer any interest of Borrower in the Mortgaged Property or any portion thereof, (ii) pledge, mortgage, hypothecate, or place a Lien on or otherwise encumber Borrower's interest in the Mortgaged Property or any portion thereof, (iii) permit the conveyance, sale, assignment, pledge, mortgage, hypothecation or other transfer or disposition, either directly or indirectly or through one or more step transactions or tiered transactions, of interests in Borrower, Sole Member or Managing Member or in the members, partners, shareholders, principals or trustees of Borrower, Sole Member or Managing Member, or (iv) enter into or permit to be entered into any agreement or arrangement to do any of the foregoing (each of the aforesaid acts referred to in clauses (i) through (iv) above being referred to herein as a "Transfer").  Any conveyance, sale, assignment, lease, pledge, mortgage, hypothecation, encumbrance or transfer deemed to be such by operation of law shall also be deemed to be a Transfer.  Any attempted Transfer in violation of this Section shall be void and of no force or effect.

As used herein, the term "Permitted Transfer" means:

(A)     transfers of direct and indirect membership interests in Borrower, provided that (i) Frank T. Sinito, or is his spouse, children or grandchildren, or trusts for the benefit of such spouse, children or grandchildren, maintains at least 51%, in the aggregate, of the ownership interests in the Managing Member, (ii) Managing Member maintains day-to-day operational control of Borrower and the Mortgaged Property; and (iii) one or more of Managing Member and ERI/Statler Holdings LLC (or affiliate(s) of either of the foregoing) directly or indirectly collectively maintains at least 51%, in the aggregate, of the ownership interests in Borrower; further provided that, with respect to any transfer to persons or entities acquiring twenty (20%) percent or greater (in the aggregate) interest in Borrower, Lender is provided with (a) sufficient information to determine compliance with Lender's OFAC, ERISA and "KYC" requirements, and (b) any and all financial statement reasonably required by Lender with respect to any such successor person or entity.  Borrower shall provide Lender with notice of any Permitted Transfer not less than ten (10) Business Days prior to the transfer.  In addition, if Managing Member or its affiliate is no longer managing the day-to-day operations of Borrower (a "Change in Control"), such Change of Control shall be subject to the prior approval of Lender, and further any such Change in Control will require Lender's prior written approval of (i) a replacement property manager acceptable to Lender in its reasonable discretion, and (ii) a replacement of the Guarantor by a Replacement Guarantor as provided in Article 9 hereof;

(B)     Leases permitted by the Loan Documents;

(C)     Transfers of obsolete or worn out personal property or fixtures that are contemporaneously replaced by items of equal or better function and quality; and

(D)     Permitted Exceptions.

4885-3089-1555, v. 2

Section 8.02. <u>Taxes; Charges</u>. Borrower shall pay before any fine, penalty, interest or cost may be added thereto, and shall not enter into any agreement to defer, any real estate taxes and assessments, franchise taxes and charges, and other governmental charges that may become a lien upon the Mortgaged Property or become payable during the term of the Loan, and will promptly furnish Lender with evidence of such payment, provided, however that Borrower shall not have such obligations so long as sufficient funds are deposited in a tax escrow account with Lender in accordance with the provisions set forth herein.  Borrower shall not suffer or permit the joint assessment of the Mortgaged Property with any other real property constituting a separate tax lot or with any other real or personal property.  Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in a lien on the Mortgaged Property; provided, however, Borrower may contest any taxes and/or assessments or the validity of such claims and demands so long as: (i) Borrower notifies Lender of the intention to contest such taxes, assessments, claim or demand, (ii) Borrower provides Lender with an indemnity, bond or other security reasonably satisfactory to Lender assuring the discharge of Borrower's obligations for such taxes, assessments, claims and demands, including interest and penalties, and (iii) Borrower is diligently contesting the same by appropriate legal proceedings in good faith and at its own expense and concludes such contest prior to the tenth (10th) day preceding the earlier to occur of the Maturity Date or the date on which the Mortgaged Property is scheduled to be sold for non-payment unless any indemnity or bond which has been provided results in the unconditional postponement of any sale for non-payment.

Section 8.03. <u>Control; Management</u>. There shall be no change in the day-to-day control and management of Borrower without the prior written consent of Lender.   Borrower shall not terminate, replace or appoint any manager or terminate or materially amend any Material Agreement providing for the management, marketing, sales, leasing or operation of all or any part of the Mortgaged Property without Lender's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Unless otherwise approved by Lender, any management and/or marketing and sales agreement for the Mortgaged Property shall be terminable upon thirty (30) days' Notice, and shall be assigned to Lender pursuant to an assignment in form and substance satisfactory to Lender in its commercially reasonable discretion. Lender hereby approves the terms of the Property Management Agreement, including, without limitation, Section 24 thereof, subject to the subordination thereof to the lien of the Mortgage pursuant to the Subordination of Management Agreement. Each manager of the Mortgaged Property shall hold and maintain all necessary licenses, certifications and permits required by law.  Borrower shall fully perform its covenants, agreements and obligations under any management agreement to which it is a party entered into after the date hereof.

Section 8.04. <u>Operation; Maintenance; Inspection</u>. Borrower shall observe and comply in all material respects with all legal requirements applicable to the ownership, use and operation of the Mortgaged Property.  Borrower shall maintain the Mortgaged Property in good condition, reasonable wear and tear excepted, and promptly repair any damage or casualty.  Borrower shall permit Lender and its agents, representatives and employees, upon reasonable prior Notice to Borrower, to inspect the Mortgaged Property and conduct such environmental and engineering

41

studies as Lender may require in accordance with the provisions of the Environmental Indemnity, provided such inspections and studies do not materially and unreasonably interfere with the use and operation of the Mortgaged Property.

Section 8.05. <u>Taxes on Security</u>. Borrower shall pay all taxes (including any documentary stamp taxes and intangible personal property taxes), charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender.  If there shall be enacted any law (1) deducting the Loan from the value of the Mortgaged Property for the purpose of taxation, (2) affecting any lien on the Mortgaged Property, or (3) changing existing laws of taxation of mortgages or debts secured by real property, or changing the manner of collecting any such taxes, Borrower shall, so long as any such change is not a replacement of any existing income, franchise, or doing business taxes, promptly pay to Lender, within ten (10) Business Days after written demand setting forth the amount due, all taxes, costs and charges for which Lender is or may be liable as a result thereof; provided, however, if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable.

Section 8.06. <u>Legal Existence; Name, Etc</u>. Borrower shall preserve and keep in full force and effect its existence as a Single Purpose Entity, entity status, franchises, rights and privileges under the laws of the state of its formation, and all qualifications, licenses and permits applicable to the ownership, use and operation of the Mortgaged Property. Borrower shall not wind up, liquidate, dissolve, reorganize, merge, or consolidate with or into, or convey, sell, assign, transfer, lease (except for Leases permitted hereunder or under any of the other Loan Documents), or otherwise dispose of all or substantially all of its assets, or acquire all or substantially all of the assets of the business of any Person.  Borrower shall conduct business only in its own name and shall not change its name, identity, or organizational structure, or the location of its chief executive office or principal place of business unless Borrower (a) shall have obtained the prior written consent of Lender to such change (provided that such consent shall not be required for a change in the location of the chief executive office or principal place of business so long as Lender is provided with prior written notice of any change in location), and (b) shall have taken all actions necessary or requested by Lender to file or amend any financing statement or continuation statement to assure perfection and continuation of perfection of security interests under the Loan Documents.  Borrower shall maintain separate books, records, and accounts and observe corporate and partnership formalities independent of any other entity, shall pay its obligations with its own funds and shall not commingle funds or assets with those of any other entity.

Section 8.07. <u>Affiliate Transactions</u>. Without the prior written consent of Lender, which consent shall not be unreasonably withheld, Borrower shall not engage in any transaction affecting the Mortgaged Property with any Affiliate of any Borrower Party, provided, however, that such consent shall not be required for routine transactions that are executed on commercially

42

reasonable and arm-length terms and that do not involve financing or debt, which shall include without limitation, Borrower's performance under the Property Management Agreement.

Section 8.08. Limitation on Other Debt. Borrower shall not, without the prior written consent of Lender, incur any debt other than the Loan, the Subordinate Debt, and customary trade payables which are payable, and shall be paid, in accordance with the customary terms thereof.

Section 8.09. Further Assurances. Borrower shall promptly (i) cure any defects in the execution and delivery of the Loan Documents, and (ii) execute and deliver, or cause to be executed and delivered, all such other documents, agreements and instruments as Lender may reasonably request to further evidence and more fully describe the collateral for the Loan, to perfect, protect or preserve any liens created under any of the Loan Documents, or to make any recordings, file any Notices, or obtain any consents, as may be necessary or appropriate in connection therewith.

Section 8.10. Estoppel Certificates. Borrower, within ten (10) Business Days after request by Lender, shall furnish to Lender a written statement, duly acknowledged, setting forth the amount due on the Loan, the terms of payment of the Loan, the date to which interest has been paid, whether any offsets or defenses exist against the Loan and, if any are alleged to exist, the nature thereof in detail, and such other matters as Lender reasonably may request.

Section 8.11. Notice of Certain Events. Borrower shall promptly notify Lender of any of the following:

A.      any Event of Default, together with a detailed statement of the steps being taken to cure such Event of Default;

B.      any Notice of default received by Borrower under other obligations relating to the Mortgaged Property or otherwise material to Borrower's business; and

C.      any threatened or pending legal, judicial or regulatory proceedings, including any dispute between Borrower and any Governmental Authority, affecting Borrower or the Mortgaged Property that could potentially have a Material Adverse Effect on the Mortgaged Property, and in any event if such dispute involves an amount in controversy in excess of $250,000.

Section 8.12. Indemnification. Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever actually incurred by Lender, including the reasonable fees and actual expenses of Lender's outside counsel, in connection with (i) any inspection, review or testing of or with respect to the Mortgaged Property to the extent provided for herein or in any other Loan Document, (ii) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not

43

Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to the execution, delivery or performance of any Loan Document or to the Mortgaged Property, (iii) any proceeding instituted by any Person claiming a lien, and (iv) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan, the Mortgaged Property, or any of the transactions contemplated in the Loan Documents, including those arising from the joint, concurrent, or comparative negligence of Lender, except to the extent any of the foregoing is caused by Lender's or its agent's gross negligence or willful misconduct.

Section 8.13. <u>Property Specific Covenants</u>. Borrower covenants and agrees that it shall not, without the prior written consent of Lender, take or fail to take any action that may (i) reduce the total number of parking spaces at the Mortgaged Property to less than the minimum number of parking spaces required by all applicable laws and rules of all Governmental Authorities, or (ii) reduce the gross floor area of the Building. Borrower shall timely file applications for, and take all other steps necessary to obtain, all tax abatements available for the Mortgaged Property.

Section 8.14. <u>Material Agreements and Leases</u>. Except as provided in the Assignment of Leases, this Agreement or any other Loan Document, Borrower shall not enter into, materially amend, materially modify, permit an assignment or subletting with respect to, terminate, surrender, take material discretionary action with respect to, or cancel any Lease of any portion of the Mortgaged Property or any Material Agreement without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Borrower may enter into, modify or cancel Residential Leases in the ordinary course of business without the prior consent of Lender. Borrower shall promptly deliver to Lender copies of all notices of default received by Borrower under any Material Agreements or any Commercial Lease. Upon written request by Borrower, Lender shall execute Subordination, Non-Disturbance and Attornment Agreements, in form and content reasonably acceptable to Lender, in connection with new Commercial Leases to be entered into by Borrower with respect to the Mortgaged Property.

Section 8.15. <u>Subordination of Fees</u>. The terms and conditions of all arrangements whereby Borrower, Guarantor or any Affiliate of any Borrower Party, is or may be entitled to fees or commissions with respect to the Mortgaged Property shall be disclosed to Lender, and any such payment of any fees or compensation to be made by or on behalf of Borrower or Guarantor to any of such persons or entities shall be fully subordinated to the payment in full of the Loan and no such payment shall be made upon the occurrence and during the continuance of an Event of Default.

Section 8.16. <u>ERISA</u>. Borrower shall not establish, acquire or maintain an ERISA Plan. Borrower shall not assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of its interest or rights in this Agreement or in the Mortgaged Property, nor shall any party owning a direct or indirect interest in Borrower assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of any of its rights or interest (direct or indirect) in Borrower, if such action

44

would cause the Loan, or the exercise of any of Lender's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Code or otherwise result in Lender being deemed in violation of any applicable provision of ERISA. Borrower agrees to indemnify and hold Lender free and harmless from and against all losses, costs (including attorneys' fees and expenses), taxes, damages (including consequential damages) and reasonable expenses Lender may suffer by reason of any breach of this Section 8.16 due to the actions of Borrower, including costs of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Lender's sole judgment or by reason of a breach of the foregoing prohibitions. The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Note, notwithstanding any limitations on recourse contained herein or in any of the Loan Documents.

In the event that after the date hereof, Borrower, Guarantor or Lender becomes aware, or reasonably determines, that the Loan transaction or continuing to participate in the Loan transaction constitutes a "prohibited transaction" (within the meaning of either Section 406 of ERISA or Code Section 4975(c)), without regard to whether on account of a change in circumstances or otherwise, the parties to this Agreement shall cooperate with each other and the Department of Labor and shall use commercially reasonable efforts to correct the circumstance that gives rise to the Loan transaction being a prohibited transaction so that the Loan transaction is no longer a prohibited transaction.

Section 8.17. <u>Union Labor</u>. During the term of the Loan, Borrower agrees to use only contractors and subcontractors having collective bargaining agreements with unions affiliated with the Building and Construction Trades Department of the AFL-CIO as of January 1, 2001 to perform the following work on the Mortgaged Property: (i) expansion of the physical dimensions of the Building, (ii) any work in connection with a restoration of the Mortgaged Property following a casualty, (iii) transportation of any major construction materials, (iv) replacement of the roof of the Mortgaged Property, (v) major repair to or replacement of any HVAC system of the Mortgaged Property, (vi) elevator repair and maintenance, and/or (vii) the repair, replacement or installation of any electric panel board(s) and entry service cables. Any breach of the foregoing requirements during the term of the Loan shall entitle Lender to increase the Interest Rate by $1/8^{th}$ of 1% per breach for the remaining term of the Loan.

Section 8.18. <u>Licenses</u>. Borrower shall at all times comply with all obligations and duties of Borrower under the Licenses, including but not limited to all payment obligations of Borrower thereunder. Borrower shall not materially modify or amend, or terminate either or both of the Licenses without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. Borrower shall promptly deliver to Lender copies of any notices of default received from the licensor under either or both of the License Agreements.

ARTICLE 9
EVENTS OF DEFAULT

45

4885-3089-1555, v. 2

Each of the following shall constitute an Event of Default under the Loan:

Section 9.01 <u>Payments</u>.

A.    Borrower's failure to pay any regularly scheduled installment of principal or interest within five (5) days of the date when due under the Loan Documents, or Borrower's failure to pay the Loan at the Maturity Date, whether by acceleration or otherwise.

B.    Borrower's failure to pay any other amounts due under the Loan Documents (excluding regularly scheduled installments of interest and principal), when and as the same shall have become due and payable as in the Note and any other Loan Document provided, or in the performance of any of Borrower's other obligations under any of the Loan Documents which performance consists solely of the payment of a sum of money, (i) prior to maturity (whether such maturity occurs by acceleration, lapse of time or otherwise), if such default shall have continued for a period of ten (10) Business Days after Notice thereof to Borrower, and (ii) upon maturity (whether such maturity occurs by acceleration, lapse of time or otherwise).

Section 9.02. <u>Insurance</u>. Borrower's failure to maintain insurance as required under Section 6.01 of this Agreement.

Section 9.03. <u>Sale, Encumbrance, Etc</u>. The sale, transfer, conveyance, pledge, mortgage or assignment of any part or all of the Mortgaged Property, or any interest therein, or of any interest in Borrower in violation of Section 8.01 of this Agreement.

Section 9.04. <u>Covenants</u>. Borrower's failure to perform or observe any of the agreements and covenants contained in this Agreement or in any of the other Loan Documents (other than payments under Section 9.01, insurance requirements under Section 9.02, and transfers and encumbrances under Section 9.03), and the continuance of such failure for thirty (30) days after Notice by Lender to Borrower.  The notice and cure provisions of this Section 9.04 do not apply to the Events of Default described in Section 9.05, Section 9.06, Section 9.07 and Section 9.08.

Section 9.05. <u>Representations and Warranties</u>. Any representation or warranty made in any Loan Document proves to be untrue in any material respect when made or deemed made; provided, however, that such untruth shall not constitute an Event of Default if such untruth (i) is inadvertent and non-recurring, (ii) is curable and Borrower promptly cures such breach within thirty (30) days after becoming aware of such breach, and (iii) does not have a Material Adverse Effect.

Section 9.06. <u>Other Encumbrances</u>. Any default under any document or instrument, other than the Loan Documents, evidencing or creating a lien on the Mortgaged Property or any part thereof, which continues beyond the expiration of the applicable grace or cure period thereunder, provided however, with respect to any mechanic's, materialmen's or laborer's Lien, the filing of

any such Lien shall not be deemed an Event of Default so long as all of the requirements of Section 8.02 have been and are being satisfied.

Section 9.07. <u>Involuntary Bankruptcy or Other Proceeding</u>. Commencement of an involuntary case or other proceeding against any Borrower Party (each, a "Bankruptcy Party") which seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of one hundred twenty (120) days; or an order for relief against a Bankruptcy Party shall be entered in any such case under the Federal Bankruptcy Code and not dismissed within one hundred twenty (120) days.

Section 9.08. <u>Voluntary Petitions, etc</u>. Commencement by a Bankruptcy Party of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by a Bankruptcy Party to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making by a Bankruptcy Party of a general assignment for the benefit of creditors, or the failure by a Bankruptcy Party, or the admission by a Bankruptcy Party in writing of its inability, to pay its debts generally as they become due, or any action by a Bankruptcy Party to authorize or effect any of the foregoing.

Section 9.09. <u>Other Documents</u>. The continuance of a default or an event of default by Borrower beyond any applicable cure period under (i) any Material Agreement, or (ii) any Commercial Lease; to the extent the same is reasonably expected to result in a Material Adverse Effect.

Section 9.10. <u>Default under Other Loan Documents</u>. If any Event of Default (as defined or described in any other Loan Document) shall have occurred and be continuing under any such other Loan Document, beyond the expiration of the applicable notice and cure period provided in such Loan Document.

Section 9.11. <u>Invalidity of Guaranty</u>. If the Guaranty is not in full force and effect or ceases at any time to be valid, binding and enforceable against the respective parties thereto prior to the termination thereof in accordance with its respective terms; provided, however, that notwithstanding this Section 9.11 or any other provision of the Loan Documents, the failure of any of the Guarantees to remain in full force and effect or to be valid, binding and enforceable against any individual Guarantor (and the heirs, estate or personal representative of such individual Guarantor) as a result of the death or incapacity of such Guarantor shall not be an Event of Default hereunder if Borrower provides Lender with one or more substitute Guarantors or substitute collateral acceptable to Lender in its sole discretion within ninety (90) days of such death or incapacity.

4885-3089-1555, v. 2

Section 9.12. Reserved.

Section 9.13. Judgments.  If (a) a final unappealable judgment in excess of $100,000 shall be entered against any Borrower Party and shall not be covered by insurance, bonded over or paid by Borrower or such Borrower Party within sixty (60) days after the entry thereof, or shall have failed to appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and to have secured a stay of execution pending such appeal, or (b) if any Borrower Party shall default beyond any applicable grace period in the payment of any obligation in excess of $250,000.

Notwithstanding any provision herein to the contrary, the occurrence of any of the events described in this Article 9 pertaining to Guarantor (each a "Guarantor Breach"), shall not comprise an Event of Default hereunder to the extent a Replacement Guarantor (defined below) is accepted by Lender pursuant to the terms of this Section. Upon the occurrence of a Guarantor Breach, then provided that no additional Event of Default exists and is continuing under the Loan Documents, within forty-five (45) days after the occurrence of any such event, Borrower shall have the right to replace such defaulting Guarantor with a replacement or substitute guarantor (the "Replacement Guarantor") having a net worth and financial condition (as determined by Lender in its sole discretion) in an amount not less than Guarantor and in any event in compliance with the financial covenants set forth in Section 4.8 of the Guaranty, and otherwise acceptable to Lender in its sole discretion.  Notwithstanding anything to the contrary in this Loan Agreement or in any other Loan Documents, the replacement of Guarantor pursuant hereto shall not be deemed or construed as a waiver of any additional or then other Event of Default.  The Replacement Guarantor, if approved by Lender hereunder in its sole discretion, shall execute and deliver to Lender a replacement Guaranty and a replacement Environmental Indemnity in form and content substantially the same as Guaranty and Environmental Indemnity executed as of the date hereof.  All costs incurred by Lender in connection with such Replacement Guarantor, including reasonable attorneys' fees, shall be promptly reimbursed by Borrower to Lender.

ARTICLE 10
REMEDIES

Section 10.01. Remedies - Insolvency Events.  Upon the occurrence and during the continuance of any Event of Default under Section 9.07 or 9.08, all amounts due under the Loan Documents immediately shall become due and payable, all without further written notice and without further presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or any other notice of default of any kind, all of which are hereby expressly waived by the parties hereto; provided, however, if the Bankruptcy Party under Section 9.7 or 9.8 is other than Borrower, then all amounts due under the Loan Documents shall become immediately due and payable at Lender's election, in Lender's sole discretion.

48

Section 10.02. <u>Remedies - Other Events</u>. Except as set forth in Section 10.01 above, while any Event of Default exists, Lender may (1) by written Notice to Borrower, declare the entire Loan to be immediately due and payable without further presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of default of any kind, all of which are hereby expressly waived by Borrower, (2) terminate the obligation, if any, of Lender to advance amounts hereunder, and (3) exercise all rights and remedies therefor under the Loan Documents and at law or in equity.

Section 10.03. <u>Additional Security</u>.  As additional security for Borrower's obligations under this Agreement and the Loan Documents, Borrower irrevocably assigns to Lender, and grants to Lender a security interest in, (i) its interest in all Loan proceeds held by Lender, whether or not disbursed, (ii) all funds deposited by Borrower with Lender under this Agreement or any of the Loan Documents, and (iii) all governmental permits and licenses obtained for the lawful operation of the Mortgaged Property.

ARTICLE 11
MISCELLANEOUS

Section 11.01. <u>Notices</u>. All notices, demands, consents, approvals and other communications (collectively, "Notices") hereunder shall be in writing and shall be sent by postage prepaid, certified or registered mail, return receipt requested, or by reputable overnight courier service, postage prepaid, addressed to the party to be notified as set forth below:

if to Lender,

The Union Labor Life Insurance Company
8403 Colesville Road
Attn: Herbert A. Kolben, Senior Vice President, Real Estate
   Investment Group

with a copy to,

The Union Labor Life Insurance Company
1625 Eye Street, N.W., 2nd Floor
Washington, D.C.  20006
Attn:  General Counsel
With an additional copy to,

Meyer, Unkovic & Scott LLP
535 Smithfield Street, Suite 1300
Pittsburgh, PA 15222
Attn: Matthew D. Whitworth, Esq.

4885-3089-1555, v. 2

If to Borrower,

Statler Cleveland Holding, LLC
127 Public Square, 4000 Key Tower
Cleveland, Ohio 44114-1309
Attn: Frank T. Sinito

with a copy to:

Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Attn: George Skupski, Esq.

and

Equity Resource Investments, LLC
1280 Massachusetts Ave, Suite 400
Cambridge, MA 02138
Attention: Joanne D.C. Foley
Email: joanne@erillc.com

Notices shall be deemed given when a legible copy is received two (2) Business Days after mailing (or one (1) Business Day for overnight courier service), with failure to accept delivery constituting delivery for this purpose. Any party hereto may change the addresses for Notices set forth above by giving at least ten (10) days' prior Notice of such change in writing to the other party as aforesaid and otherwise in accordance with these provisions, provided that no Notices shall be required to be sent to more than three (3) entities or persons. Any notice may be given on behalf of any party by its counsel.

Section 11.02. <u>Amendments and Waivers</u>. No amendment or waiver of any provision of the Loan Documents shall be effective unless in writing and signed by the party against whom enforcement is sought.

Section 11.03. <u>Limitation on Interest</u>. It is the intention of the parties hereto to conform strictly to applicable usury laws. Accordingly, all agreements between Borrower and Lender with respect to the Loan are hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to Lender or charged by Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by law. If the Loan would be usurious under applicable law (including the laws of the State of Ohio and the laws of the United States of America), then, notwithstanding anything to the contrary in the Loan Documents:

50

A.     the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited on the Note by the holder thereof (or, if the Note has been paid in full, refunded to Borrower); and

B.     if maturity is accelerated by reason of an election by Lender, or in the event of any prepayment, then any consideration which constitutes interest may never include more than the maximum amount allowed by applicable law. In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform through the term hereof.  If such amortization, proration, allocation and spreading is not permitted under applicable law, then such excess interest shall be cancelled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note has been paid in full, refunded to Borrower). The terms and provisions of this Section 11.03 shall control and supersede every other provision of the Loan Documents.  The Loan Documents are contracts made under and shall be construed in accordance with and governed by the laws of the State of Ohio, except that if at any time the laws of the United States of America permit Lender to contract for, take, reserve, charge or receive a higher rate of interest than is allowed by the laws of the State of Ohio (whether such federal laws directly so provide or refer to the law of any state), then such federal laws shall to such extent govern as to the rate of interest which Lender may contract for, take, reserve, charge or receive under the Loan Documents.

Section 11.04. <u>Invalid Provisions</u>. If any provision of any Loan Document is held to be illegal, invalid or unenforceable, such provision shall be fully severable; the Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

Section 11.05. <u>Reimbursement of Expenses</u>. Borrower shall pay all out-of-pocket expenses incurred by Lender in connection with the Loan, including reasonable fees and expenses of Lender's attorneys, environmental, engineering and other consultants, and fees, charges or taxes for the recording or filing of Loan Documents. Borrower shall pay all out-of-pocket expenses of Lender in connection with the administration of the Loan, including audit costs, inspection fees, settlement of condemnation and casualty awards, and premiums for title insurance and endorsements thereto.  Borrower shall, upon request, promptly reimburse Lender for all amounts expended, advanced or incurred by Lender to collect the Note, or to enforce the rights of Lender under this Agreement or any other Loan Document, or to defend or assert the rights and claims of Lender under the Loan Documents or with respect to the Mortgaged Property (by litigation or other proceedings), which amounts will include all court costs,

51

reasonable attorneys' fees and reasonable expenses, fees of auditors and accountants, and investigation expenses as may be incurred by Lender in connection with any such matters (whether or not litigation is instituted), together with interest at the Applicable Interest Rate or the Default Rate, as applicable, on each such amount from the date of disbursement until the date of reimbursement to Lender, all of which shall constitute part of the Loan and shall be secured by the Loan Documents.  Lender may pay the costs described in this Section 11.05 at any time by an advance under the Loan in accordance with the terms of this Agreement, and the outstanding principal amount of the Loan shall be increased thereby as of the date of such advance.

Section 11.06.  Approvals; Third Parties; Conditions.  All approval rights retained or exercised by Lender with respect to Leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person. This Agreement is for the sole and exclusive use of Lender, Borrower and Guarantor and may not be enforced, nor relied upon, by any Person other than Lender, Borrower and Guarantor. All conditions of the obligations of Lender hereunder are imposed solely and exclusively for the benefit of Lender, its successors and assigns, and no other Person shall have standing to require satisfaction of such conditions, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Lender at any time in Lender's sole and reasonable discretion.

Section 11.07.  Lender Not in Control; No Partnership.  None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the rights to exercise the remedies referred to in the Loan Documents.  The relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor.  No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower or to create an equity in the Mortgaged Property in Lender.  Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other person with respect to the Mortgaged Property or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (i) Lender is not, and shall not be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of any Borrower Party or any of its Affiliates and Lender does not intend to ever assume such status; (ii) Lender shall in no event be liable for any Debts, expenses or losses incurred or sustained by any Borrower Party unless and only to the extent expressly provided otherwise in this Agreement; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of any Borrower Party or any of its Affiliates.  Lender, Borrower and Guarantor disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Lender, Borrower or Guarantor, or to create an equity in the Mortgaged Property in Lender, or any sharing of liabilities, losses, costs or expenses.

Section 11.08. <u>Time of the Essence</u>. Time is of the essence with respect to this Agreement.

Section 11.09. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns, provided that neither Borrower nor any other Borrower Party shall, without the prior written consent of Lender, assign any rights, duties or obligations hereunder.

Section 11.10. <u>Renewal, Extension or Rearrangement</u>. All provisions of the Loan Documents shall apply with equal effect to each and all promissory notes and amendments thereof hereinafter executed which in whole or in part represent a renewal, extension, increase or rearrangement of the Loan.  For portfolio management purposes, Lender may elect to divide the Loan into two or more separate loans evidenced by separate promissory notes so long as the payment, costs, expenses, and other obligations of Borrower are not effectively increased or otherwise modified. Borrower agrees to cooperate with Lender and to execute such documents as Lender reasonably may request to effect such division of the Loan.

Section 11.11. <u>Waivers</u>. No course of dealing on the part of Lender, its officers, employees, consultants or agents, nor any failure or delay by Lender with respect to exercising any right, power or privilege of Lender under any of the Loan Documents, shall operate as a waiver thereof.

Section 11.12. <u>Cumulative Rights</u>. Rights and remedies of Lender under the Loan Documents shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

Section 11.13. <u>Singular and Plural</u>. Words used in this Agreement and the other Loan Documents in the singular, where the context so permits, shall be deemed to include the plural and vice versa.  The definitions of words in the singular in this Agreement and the other Loan Documents shall apply to such words when used in the plural where the context so permits and vice versa.

Section 11.14. <u>Phrases</u>. When used in this Agreement and the other Loan Documents unless and only to the extent expressly provided otherwise in this Agreement, the phrase "including" shall mean "including, but not limited to," the phrase "satisfactory to Lender" shall mean "in form and substance reasonably satisfactory to Lender in all respects," the phrase "with Lender's consent" or "with Lender's approval" shall mean such consent or approval at Lender's reasonable discretion, and the phrase "acceptable to Lender" shall mean "acceptable to Lender at Lender's sole reasonable discretion."  Notwithstanding the foregoing to the contrary, any such determination during the continuance of an Event of Default shall be in Lender's sole discretion. Unless the context of this Agreement otherwise requires, (i) words of any gender are deemed to include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section"

53

4885-3089-1555, v. 2

refer to the specified Article or Section of this Agreement; (v) the term "party" means Lender or Borrower, as the case may be; and (vi) all references to "dollars" or "$" refer to currency of the United States of America.

Section 11.15. <u>Exhibits and Schedules</u>. The exhibits and schedules attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein.

Section 11.16. <u>Titles of Articles, Sections and Subsections</u>. All titles or headings to articles, sections, subsections or other divisions of this Agreement and the other Loan Documents or the exhibits hereto and thereto are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

Section 11.17. <u>Promotional Material</u>. Borrower authorizes Lender to issue press releases, advertisements and other promotional materials in connection with Lender's own promotional and marketing activities, and describing the Loan in general terms or in detail and Lender's participation in the Loan.  All references to Lender contained in any press release, advertisement or promotional material issued by Borrower shall be approved in writing by Lender in advance of issuance, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 11.18. <u>Survival</u>. Subject to the terms and conditions set forth herein and in the other Loan Documents, all of the representations, warranties, covenants, and indemnities hereunder (including environmental matters under Section 7.05), and under the indemnification provisions of the other Loan Documents shall survive the repayment in full of the Loan and the release of the liens evidencing or securing the Loan, and shall survive the transfer (by sale, foreclosure, conveyance in lieu of foreclosure or otherwise) of any or all right, title and interest in and to the Mortgaged Property to any party, whether or not an Affiliate of any Borrower Party.

Section 11.19. <u>Waiver of Jury Trial</u>. To the maximum extent permitted by law, Borrower, Guarantor and Lender hereby knowingly, voluntarily and intentionally waive the right to a trial by jury in respect of any litigation based hereon, arising out of, under or in connection with this Agreement or any other loan document, or any course of conduct, course of dealing, statement (whether verbal or written) or action of either party or any exercise by any party of their respective rights under the Loan Documents or in any way relating to the Loan or the Mortgaged Property (including, without limitation, any action to rescind or cancel this Agreement, and any claim or defense asserting that this Agreement was fraudulently induced or is otherwise void or voidable). This waiver is a material inducement for Lender to enter this Agreement.

Section 11.20. <u>Governing Law</u>. The Loan Documents are being executed and delivered, and are intended to be performed, in the State of Ohio and the laws of the Ohio and of the United States of America shall govern the rights and duties of the parties hereto and the validity, construction, enforcement and interpretation of the Loan Documents, except to the extent

54

otherwise specified in any of the Loan Documents.  The parties hereto irrevocably submit to the non-exclusive jurisdiction of any state or federal court sitting in Cuyahoga County, Ohio, over any suit, action or proceeding arising out of or relating to this Loan Agreement.

Section 11.21.  Entire Agreement.  Except for the Loan Application, which shall survive the execution of this Agreement, this Agreement and the other Loan Documents embody the entire agreement and understanding between Lender and Borrower and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.  Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.  The Loan Application shall be deemed supplemental to, and not in derogation of, this Agreement and the other Loan Documents, however, to the extent of any conflicts between any of the terms, conditions and provisions of this Agreement and the other Loan Documents with the Loan Application, the terms, provisions and conditions of this Agreement and the other Loan Documents shall govern and control.

Section 11.22.  Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.  It shall not be necessary for the same counterpart to be signed by all of the parties in order for this instrument to be fully binding upon any party signing at least one counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.23.  Sale of Interest by Lender.  Lender, at no material expense to Borrower, (i) may sell, assign or transfer all or a portion of its rights and obligations under this Agreement, and (ii) participate or syndicate all or any portion of the Loan.

Section 11.24.  Date of Performance.  If the date for the performance of any term, provision or condition (monetary or otherwise) under the Loan or this Agreement shall happen to fall on a Saturday, Sunday or non-Business Day, the date for the performance of such term, provision or condition shall be extended to the next succeeding Business Day immediately thereafter occurring, with interest on the Principal Sum at the Interest Rate to such next succeeding Business Day if such term, provision or condition shall result in the extension of any monetary payment due to Lender.

Section 11.25.  Consent to Jurisdiction.  Borrower does hereby irrevocably and unconditionally submit to the jurisdiction of the courts of the State of Ohio and does further irrevocably and unconditionally stipulate and agree that the Federal and state courts in and for County of Cuyahoga shall have jurisdiction to hear and finally determine any dispute, claim, controversy or action arising out of or connected (directly or indirectly) with this Agreement, the Note and/or the other Loan Documents.  Nothing in this Agreement shall affect the right of Lender to bring an action or proceeding against Borrower or its property in the courts of any other jurisdiction.  To the extent that Borrower has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment

55

prior to judgment, attachment in aid of execution, execution or otherwise), with respect to Borrower's property, Borrower hereby unconditionally and irrevocably waives such immunity in respect of its obligations under this Agreement, the Note and/or the Loan Documents.  The foregoing consent, in advance, to the jurisdiction of the above-mentioned courts is a material inducement for Lender to make the Loan.  Borrower, by executing this Agreement, unconditionally and irrevocably consents and ratifies the terms and conditions of this Section 11.25.

Section 11.26. <u>Documents Satisfactory to Lender</u>. All documents and other matters required by any of the provisions of this Agreement to be submitted or provided to Lender shall be in form and substance reasonably satisfactory to Lender.

Section 11.27. <u>Construction</u>. Borrower and Lender agree that the terms and conditions of this Agreement and the other Loan Documents are the result of negotiations between the parties and that this Agreement and the other Loan Documents shall not be construed in favor of or against any party by reason of the extent to which any party or its professionals participated in the preparation of this Agreement.

Section 11.28. <u>Notice of Breach by Lender</u>. Borrower agrees to give Lender written Notice of any action or inaction by Lender or any agent or attorney of Lender in connection with this Agreement or any other Loan Document or the obligations of Borrower under this Agreement or any other Loan Document that may be actionable against Lender or any agent or attorney of Lender or a defense to payment of any obligations of Borrower under this Agreement or any other Loan Document for any reason, including commission of a tort or violation of any contractual duty or duty implied by law. Borrower agrees that unless such Notice is given promptly (and in any event within sixty (60) days after Borrower has actual Knowledge of any such action or inaction), Borrower shall not assert, and Borrower shall be deemed to have waived, any claim or defense arising therefrom to the extent that Lender could have mitigated such claim or defense after receipt of such Notice.

Section 11.29. <u>Signs and Publicity</u>. All advertising and promotional materials mentioning Lender shall be submitted to Lender for its approval prior to publication or dissemination, which approval shall not be unreasonably withheld or delayed.  Lender, at its option, may elect to have signs prominently displayed on the Mortgaged Property indicating that Lender is providing financing for the Mortgaged Property. The cost of obtaining any necessary approvals for such signs and the cost of any materials, installation and maintenance of such signs shall be borne by Lender.

Section 11.30. <u>Purpose of Loan</u>. Borrower hereby represents and warrants that the indebtedness evidenced by the Note is being obtained solely for the purpose of carrying on a business or commercial enterprise.

Section 11.31. <u>Inconsistencies with Loan Documents</u>. In the event of any conflict between this Agreement and the provisions of any of the other Loan Documents, the provisions

of this Agreement shall control; provided, however, that any provision of any other Loan Document which imposes additional burdens on Borrower or restricts the rights of Borrower or gives Lender additional rights or remedies, or which provides specific rights to Borrower, shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

Section 11.32. Cross-Default. Any Event of Default under this Agreement shall be deemed to be an Event of Default under each of the other Loan Documents, entitling Lender to exercise any or all remedies available to Lender under the terms of any or all Loan Documents.

Section 11.33. Limitation on Liability of Lender's Officers, Employees, etc. Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's assets only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of any of Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

ARTICLE 12
LIMITATIONS ON RECOURSE

Section 12.01. Limitations on Recourse.  Lender agrees that, for payment of the Note, it will look solely to the Mortgaged Property and such other collateral, if any, as may now or hereafter be given to secure the payment of the Note, and no other property or assets of any Borrower Party, shall be subject to levy, execution or other enforcement procedure for the satisfaction of the remedies of Lender, or for any payment required to be made under the Note, this Agreement or any other Loan Document or for the performance of any of the covenants or warranties contained herein or therein; provided, however, that the foregoing provisions of this paragraph shall not (i) constitute a waiver of any obligation evidenced by the Note or secured by any other Loan Document, (ii) limit the right of Lender to name any Borrower Party as a party defendant in any action or suit for judicial or non-judicial foreclosure and sale or any other action or suit under the Mortgage, the Assignment of Leases or any other Loan Document, (iii) release or impair the Note, this Agreement or the lien of the Mortgage, or any other Loan Document, or (iv) release, impair or affect in any way the validity or enforceability of the Guaranty, the Environmental Indemnity or any other guaranty or indemnity agreement (whether of payment, performance and/or otherwise) given to Lender in connection with the loan evidenced hereby by Borrower, Guarantor or any other person, firm or entity who or which has expressly indemnified Lender or guaranteed Borrower's obligations under this Note or any other Loan Document to the extent of the Guaranty, the Environmental Indemnity or any other guaranty or indemnity agreement.

Section 12.02. Partial Recourse Obligations.  Notwithstanding anything herein to the contrary, Borrower shall be fully and completely liable for any and all losses, costs or damages

57

actually suffered or incurred by Lender, including but not limited to reasonable attorneys' fees, arising out of or resulting from any of the following:

A. any act of fraud committed by any Borrower Party in connection with the transactions contemplated by this Agreement, the Note or any other Loan Documents,

B. any material misrepresentation made by any Borrower Party of any material facts or circumstances in the Loan Documents related to the Mortgaged Property or any Borrower Party,

C. failure by any Borrower Party to pay any taxes assessed or payable with respect to the Mortgaged Property to the extent such taxes are not escrowed with Lender or its agent or being contested in accordance with Section 8.02 hereof,

D. failure by any Borrower Party to maintain the insurance required under the Mortgage or this Loan Agreement or to pay the premiums therefor to the extent such premiums are not escrowed with Lender or its agent,

E. failure by any Borrower Party to make deposits in the tax and insurance escrow accounts to the extent required under the Mortgage and this Loan Agreement,

F. any material, physical waste with respect to the Mortgaged Property committed by any Borrower Party,

G. the termination of any Commercial Lease of the Mortgaged Property due to Borrower's default thereunder, or

H. misapplication by any Borrower Party of (i) any Net Cash Flow from the Mortgaged Property by failing to apply the same solely to the expenses of the Mortgaged Property and payment of debt service hereunder after the occurrence and during the continuance of any Event of Default, (ii) insurance proceeds or condemnation awards, or (iii) tax deposits or security deposits by tenants relating to the Mortgaged Property or any portion thereof; or

I. Borrower's failure to pay any amounts payable by Borrower under the Licenses as and when due thereunder, or the termination of either or both Licenses due to a default by Borrower thereunder.

Nothing in this Article 12 shall be deemed to be a waiver of any right which Lender may have under any provision of the Bankruptcy Act of 1986, as amended, or any successor legislation, to file a claim for the full amount of indebtedness owed by Borrower to Lender or to require that the Mortgaged Property shall continue to secure all of the indebtedness owed by Borrower to Lender in accordance with the Mortgage and the other Loan Documents.

4885-3089-1555, v. 2

Section 12.03.  <u>Full Recourse Obligations</u>.  Notwithstanding anything to the contrary contained herein, in the Note or in any other Loan Document, Borrower and Guarantor shall be jointly and severally personally, fully and completely liable for the payment of the Note (including all principal, interest and other charges) in the event that:

A.      Borrower or Guarantor, in any judicial or quasi-judicial case, action or proceeding, directly or indirectly contests or intentionally hinders, delays or obstructs the pursuit of any rights or remedies by Lender, including but not limited to the foreclosure of the Mortgaged Property or the enforcement of any other remedy under the Loan Documents; or

B.      Borrower or Guarantor shall file a petition in bankruptcy or for an arrangement for reorganization pursuant to Title 11 of the United States Code or any similar Law, federal or state, or Borrower or Guarantor shall make an assignment for the benefit of creditors, or shall consent to the appointment of a receiver or receivers of all or any part of its property (except if such receiver was appointed by Lender).

**[SIGNATURES ON FOLLOWING PAGES]**

4885-3089-1555, v. 2

*[signature page 1 of 2 to Loan Agreement]*

IN WITNESS WHEREOF, Borrower has executed this Agreement as of the date first set forth above.

STATLER CLEVELAND HOLDING, LLC, a Delaware limited liability company

By:    STATLER CLEVELAND, LLC, an Ohio limited liability company and the Sole Member of Statler Cleveland Holding, LLC

        By:    STATLER CLEVELAND INVESTMENT, LLC, an Ohio limited liability company and the Managing Member of Statler Cleveland, LLC

        By:_____
            Frank T. Sinito,
            Managing Member

*[signature page 2 of 2 to Loan Agreement]*

IN WITNESS WHEREOF, Lender has executed this Agreement as of the date first set forth above.

THE UNION LABOR LIFE INSURANCE COMPANY, a Maryland corporation, on behalf of one or more of its Separate Accounts

By:_____

Name:_____**Jonathan McKetney**_____

Title:_____**Vice President**_____

STATE OF OHIO                          )
                                       )   ss:
COUNTY OF CUYAHOGA                     )

On this, the __13__ day of July, 2022, before me, a Notary Public, personally appeared **FRANK T. SINITO**, who acknowledged himself to be the Managing Member of **STATLER CLEVELAND INVESTMENT, LLC**, an Ohio limited liability company and the Managing Member of **STATLER CLEVELAND, LLC**, an Ohio limited liability company and the sole Member of **STATLER CLEVELAND HOLDING, LLC**, a Delaware limited liability company, and that he as such Managing Member, being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of such entity by himself as such Managing Member.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written. No oath or affirmation was administered to the signer with regard to the notarial act.

JANE LUDWIG
Notary Public
State of Ohio
My Comm. Expires
October 25, 2025

_____
Notary Public

MY COMMISSION EXPIRES:  *October 25, 2025*

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

Property 1:
Parcel No. 1: (Fee Simple)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Sublot Nos. 62 and 63 in John M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156, 157 and 158, as shown by the recorded plat in Volume "N" of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning on the northerly line of Euclid Avenue (99.00 feet wide) at its intersection with the westerly line of East 12th Street (formerly Muirson Street) (60.40 feet wide);

Thence South 79° 35' 51" west along said northerly line of Euclid Avenue 168.82 feet to the southeasterly corner of land conveyed to the Trebmal Construction Co. by deed recorded in Volume 83-0853, Page 17 of Cuyahoga County Records;

Thence North 10° 35' 39" west along the easterly line of land so conveyed to the Trebmal Construction Co. and the northerly prolongation thereof, 150.00 feet to a point;

Thence North 79° 35' 42" east 64.80 feet to a point on the westerly line of land conveyed to The Cleveland Trust Company by deed dated May 31, 1927 and recorded in Volume 3567, Page 349 of Cuyahoga County Records;

Thence North 10° 36' 09" west along said line, 169.58 feet to a point in the southeasterly line of Hickory Court, N.E. (15.12 feet wide);

Thence North 55° 48' 21" east along the southeasterly line of Hickory Court, N.E., 113.48 feet to a point in the westerly line of aforementioned East 12th Street;

Thence South 10° 36' 09" east along the westerly line of said East 12th Street, 365.36 feet to the point of beginning and containing 1.0408 acres of land as calculated and described by The North Coast Engineering and Surveying Co., Inc., in November of 1998, be the same more or less, but subject to all legal highways.

NOTE: The above premises is further known as the Apartment Parcel in the Plat of Consolidation of Statler Arms, Inc. as shown by the recorded plat in Volume 301 of Maps, Page 78 of Cuyahoga County Records.

Parcel No. 2: Appurtenant Rights

A.    Together with a nonexclusive perpetual easement for the use of the elevator and stairwell in the garage; a nonexclusive perpetual easement for access to and the use of all underground facilities serving the building located on the apartment parcel including without limitation all utility lines, pipes, ducts, equipment and facilities located on, under or over the garage parcel; a nonexclusive perpetual easement for the use of the access and service drive which extends from Hickory Court through the rear portion of the garage; a nonexclusive and perpetual easement to perform all necessary maintenance to the apartment building wall and to make penetrations into and through the garage wall for the purpose of allowing direct access from the apartment building to each floor of the garage and a nonexclusive perpetual easement to the use of the air rights above the top level of the garage for the purpose of maintaining and repairing the portions of the wall of the apartment building which extend above the top level of the garage all as reserved in the Warranty Deed from Statler Arms, Inc., an Ohio corporation to Statler Arms Garage, Inc., an Ohio corporation, dated April 27, 1999, filed for record September 21, 1999, and being Cuyahoga County Recorder's AFN 199909210866.

B.    Together with a License Agreement for Use of Ballroom by and between Statler Arms Garage, Inc., an Ohio corporation ("Original Licensor"), and Statler Arms, Inc., an Ohio corporation ("Original Licensee"), dated August 13, 1999, filed for record September 21, 1999, and being Cuyahoga County Recorder's AFN 199909210869; as assigned by Original Licensee to PAMI Statler Arms, LLC, a Delaware limited liability company ("PAMI"), by Assignment and Assumption of License Agreements, dated May 8, 2006, filed for record May 10, 2006, and being Cuyahoga County Recorder's AFN 200605100708; as modified by Amendment of License Agreement and Stipulation Settlement, dated September 23, 2008, filed for record June 3, 2011 as Instrument No. 201106030167 of Cuyahoga County, Ohio records; as assigned by PAMI to Statler Arms L/CAL LLC, a Delaware limited liability company ("L/CAL"), by unrecorded Assignment and Assumption of License Agreements, dated May 23, 2012; as consented to by HH Cleveland Statler L.P., an Ohio limited partnership ("Licensor"), successor in interest to Original Licensor, by Consent to Assignment and Assumption of License Agreements, dated December 16, 2016, filed for record December 28, 2016 as Instrument No. 201612280380 of Cuyahoga County, Ohio records; as consented to by Licensor, by unrecorded Consent to Assignment and Assumption of License Agreements, dated November 29, 2017; as assigned by L/CAL to Statler Cleveland Holding, LLC, a Delaware limited liability company ("Licensee"), by Assignment and Assumption of License Agreements dated January 30, 2018 and filed in Cuyahoga County, Ohio records as Instrument No. 201801300501.

C.    Together with a License Agreement for Use of Parking Spaces in Garage by and between Statler Arms Garage, Inc., an Ohio corporation ("Original Licensor"), and Statler Arms, Inc., an Ohio corporation ("Original Licensee"), dated August 13, 1999, filed for record September 21,

1999, and being Cuyahoga County Recorder's AFN 199909210870, as assigned by Original Licensee to PAMI Statler Arms, LLC, a Delaware limited liability company ("PAMI"), by Assignment and Assumption of License Agreements, dated May 8, 2006, filed for record May 10, 2006, and being Cuyahoga County Recorder's AFN 200605100708; as modified by Amendment of License Agreement and Stipulation Settlement, dated September 23, 2008, filed for record June 3, 2011 as Instrument No. 201106030167 of Cuyahoga County, Ohio records; as assigned by PAMI to Statler Arms L/CAL LLC, a Delaware limited liability company ("L/CAL"), by unrecorded Assignment and Assumption of License Agreements, dated May 23, 2012; as consented to by HH Cleveland Statler L.P., an Ohio limited partnership ("Licensor"), successor in interest to Original Licensor, by Consent to Assignment and Assumption of License Agreements, dated December 16, 2016, filed for record December 28, 2016 as Instrument No. 201612280380 of Cuyahoga County, Ohio records; as consented to by Licensor, by unrecorded Consent to Assignment and Assumption of License Agreements, dated November 29, 2017; as assigned by L/CAL to Statler Cleveland Holding, LLC, a Delaware limited liability company ("Licensee"), by Assignment and Assumption of License Agreements dated January 30, 2018 and filed in Cuyahoga County, Ohio records as Instrument No. 201801300501.

D.    Together with the right to construct a hoist as set forth in City of Cleveland Ordinance No. 107802.